## UNITED STATES v. HVOSLEF.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR·
THE SOUTHERN DISTRICT OF NEW YORK.

No. 331.  Argued January 13, 1915.—Decided March 22, 1915.

Under Par. 20, of § 24, of the Judicial Code, the Court of Claims has
jurisdiction of a suit against the United States for refund of money
paid for documentary stamps affixed to charter parties under § 25 of
the War Revenue Act of 1898 and the District Court of the proper
District has concurrent jurisdiction of claims of that nature not ex-
ceeding ten thousand dollars.

Under the various refunding statutes, culminating in the act of July 27,
1912, c. 256, 37 Stat. 240, such claims are founded upon a law of Con-
gress within the meaning of the Tucker Act as now incorporated in
the Judicial Code.

Although the pendency of one class of claims may have induced the
passage of an act of Congress providing for their adjustment, the
act may embrace other claims if its terms are sufficiently wide so to
do.

While under § 297, of the Judicial Code, § 5 of the Tucker Act was
saved from repeal and the District Court having jurisdiction of a
claim against the United States is the one of the District in which the
plaintiff resides, that requirement may be waived; and if no specific
objection is taken before pleading to the merits, it will be deemed to ··
have been waived, and if the District Court otherwise has jurisdic-
tion, the case may proceed.

Under the Refunding Act of July 27, 1912, protest at the time of affix-

VOL. CCXXXVII—1                              ·· (1)

ing documentary stamps was not essential to recovery. Right to repayment exists if the record shows that the sums sought to be recovered were not legally payable and the claim was duly presented within the time prescribed.

The constitutional freedom from taxation on imports assured by § 9, Art. I, of the Federal Constitution, means more than mere exemption from taxes specifically laid upon the goods themselves. It means that the process of exportation shall not be obstructed by any burden of taxation.

Where a charter party is practically a bill of lading for the entire cargo of the vessel, and is essential to the business of exportation in ship-load lots, a tax on the charter party is, in substance, a tax on exportation, and, as such, a tax on the exports, and, if on charter parties of vessels exclusively for foreign ports, is invalid under § 9, Art. I, of the Federal Constitution.

There is a distinction between tonnage taxes, as laid by the Federal Government, and export taxes, and the fact that Congress has power to lay a tonnage tax on entry does not authorize it to lay taxes on exportation which practically amount to taxes on the exports themselves.

THE facts are stated in the opinion.

*The Solicitor General,* with whom *Mr. Theodor Megaarden* was on the brief, for the United States:

The District Court was without jurisdiction of the action.

The claim of the petitioners was presented to the Commissioner of Internal Revenue and by him rejected. The remedy of petitioners was therefore an action against the Collector of Internal Revenue and not against the United States. *Edison Electric Co.* v. *United States,* 38 Ct. Cl. 208; *Nichols* v. *United States,* 7 Wall. 122, 129; *Sybrandt* v. *United States,* 19 Ct. Cl. 461; *United States* v. *Kaufman,* 96 U. S. 567; *United States* v. *Savings Bank,* 104 U. S. 728, 734.

This established rule is not altered by the act of July 27, 1912, 37 Stat. 240, upon which petitioners rely. The sole object of this act was simply the extension of time to January 1, 1914, for the filing of belated claims.

It does not affirmatively appear that the suit was brought in the district in which the petitioners reside.

The Tucker Act (under which this suit was brought) declares that it must be brought in the district where the plaintiff resides; and this provision as to venue is mandatory. *Reid Wrecking Co.* v. *United States,* 202 Fed. Rep. 314, 316.

The petition fails to state a cause of action.

There can be no recovery in the absence of any showing that the taxes were paid under protest. *Chesebrough* v. *United States,* 192 U. S. 253; *United States* v. *N. Y. & Cuba Mail S. S. Co.,* 200 U. S. 488.

And to "require" the payment of stamps upon charter parties on the part of the Treasury Department does not constitute duress, or make payment under protest unnecessary to a recovery. *United States* v. *Edmondston,* 181 U. S. 500.

The act of July 27, 1912, does not dispense with protest or duress as a condition precedent to a recovery. *Chesebrough* and *N. Y. & Cuba Mail S. S. Co. Cases, supra.*

The petition does not show that the claim for refunding was presented to the Commissioner of Internal Revenue within the statutory time.

The tax which was imposed upon charter parties was not unconstitutional.

The tax was not unconstitutional merely because it may have been measured by the cargo space of vessels employed in some instances in the export trade.

The tax in question was measured by the tonnage of the vessels chartered, and tonnage taxes may lawfully be imposed by Congress. *State Tonnage Tax Cases,* 12 Wall. 204, 216.

And a duty on tonnage may be imposed with a view to revenue, as well as with a view to the regulation of commerce. *Gibbons* v. *Ogden,* 9 Wheat. 1, 202; *State Tonnage Tax Cases, supra.*

The tax only incidentally and remotely affected articles exported.

The tax was not a tax on articles exported and the act imposing it does not come within the constitutional prohibition of a tax or duty on such articles. *Armour Packing Co.* v. *United States*, 209 U. S. 56, 79; *C., B. & Q. Ry.* v. *United States*, 209 U. S. 90.

The most that can be claimed is that the taxes were paid on goods intended for exportation; and goods intended for exportation are not exports. *Coe* v. *Errol*, 116 U. S. 517; *Cornell* v. *Coyne*, 192 U. S. 418; *Pace* v. *Burgess*, 92 U. S. 372; *Turpin* v. *Burgess*, 117 U. S. 504.

The cases of *Fairbank* v. *United States* and *United States* v. *N. Y. & Cuba Mail S. S. Co.* are easily distinguishable.

For the legislative history of the acts involved and the rules of construction applicable see *Jennison* v. *Kirk*, 98 U. S. 453, 459; *Holy Trinity Church* v. *United States*, 143 U. S. 457, 465; *American Net Co.* v. *Worthington*, 141 U. S. 468, 473; *Binns* v. *United States*, 194 U. S. 486, 495, 496; *Blake* v. *National Bank*, 23 Wall. 307, 319.

*Mr. Everett P. Wheeler*, with whom *Mr. Simon Lyon* and *Mr. R. B. H. Lyon* were on the brief, for defendants in error:

Jurisdiction of this cause was conferred upon the District Court of the United States by Judicial Code, March 3, 1911, § 24, subd. 20, by which the United States submitted itself to the jurisdiction of the District Court.

The twentieth clause was a reënactment with some extension as to amount of the act of March 3, 1887, 24 Stat. 505.

This jurisdiction is similar to that conferred upon the Court of Claims by § 145, Jud. Code.

The act of July 27, 1912, pleaded in the petition is broad, and the history of its enactment on this subject shows plainly that the act in question is not to be limited

by construction but should be construed according to its plain terms.

· The statute being "remedial in its character. and relating to the law of procedure is to be liberally construed with reference to the purpose of its enactment." *Bechtel* v. *United States,* 101 U. S. 597, 599; *United States* v. *Musgrave,* 160 Fed. Rep. 700; *United States* v. *Ninety-nine Diamonds,* 139 Fed. Rep. 961, 965.

Remedial statutes should be construed liberally. *Silver* v. *Ladd,* 7 Wall. 219; *Merchants Nat. Bank* v. *United States,* 42 Ct. Cl. 6; 1 Kent Comm. 465; *Thacher* v. *United States,* 149 Fed. Rep. 902.

The action did not have to be brought against the collector. *Kaufman's Case,* 11 Ct. Cl. 668; *Anson* v. *Murphy,* 109 U. S. 238; *Nichols* v. *United States,* 7 Wall. 122; *United States* v. *Finch,* 201 Fed. Rep. 95; *Dooley* v. *United States,* 182 U. S. 222, 228; *Christie Street Co.* v. *United States,* 136 Fed. Rep. 326; *Medbury* v. *United States,* 173 U. S. 492; *Foster* v. *United States,* 32 Ct. Cl. 170; *The Daly Case,* 26 Op. Atty. Gen. 194.

This judicial power is a real, substantial, effective jurisdiction, to hear and to decide.

When it is exercised in constitutional cases, this court, appointed and acting by virtue of the authority conferred by the people, determines whether or not their representatives in the Congress have exceeded their powers. *Fairbank* v. *United States,* 181 U. S. 283, 285.

One of the limitations upon the taxing power of Congress is that no tax or duty shall be laid on any articles exported from any State.

The presumption is in favor of the constitutionality of a statute but this presumption is less strong in favor of a statute imposing taxes in a multitude of ways, and upon a multitude of objects.

A legislature cannot do indirectly what the Constitution forbids it to do directly. *Passenger Tax Cases,* 7 How.

283, 414; *Inman Steamship Co.* v. *Tinker*, 94 U. S. 238; *Fairbank* v. *United States*, 181 U. S. 283; *United States* v. *N. Y. & Cuba Mail S. S. Co.*, 200 U. S. 488; *Steamboat Co.* v. *Livingston*, 3 Cowen, 713, 733; *Brown* v. *Maryland*, 12 Wheat. 419; *Nor. & West. Ry.* v. *Sims*, 191 U. S. 441; *Bailey* v. *Alabama*, 219 U. S. 219, 244; *West. Un. Tel. Co.* v. *Kansas*, 216 U. S. 1, 27; *Ludwig* v. *West. Un. Tel. Co.*, 216 U. S. 146, 162.

This principle is as old as the Roman law. Digest Lib. I, Tit. 3, De legibus &c., § 29; Hulot & Berthier (1805), p. 60.

The power to tax involves the power to destroy. *McCulloch* v. *Maryland*, 4 Wheat. 316, 431; *Fairbank* v. *United States*, 181 U. S. 283, 290.

Where the legislative power to tax existed, the court cannot limit its exercise, even though this would destroy the subject of taxation. *Veazie Bank* v. *Fenno*, 8 Wall. 533.

A tax on charter parties is unconstitutional, and differs in no respect from the stamp tax on export bills of lading or on manifests, both of which have been held unconstitutional. A tax upon it is as clearly a tax upon exports as was the tax in the other cases referred to. To tax either is clearly to tax the goods which they enable to be exported. See *Fairbank Case, supra.*

It is essential to the export business as it is universally used in cases of full cargo lots, and the courts treat it as one of the documents essential to such transactions. *Ireland* v. *Livingston*, L. R. 5 H. L. 395, 406; *Tamvaco* v. *Lucas*, 1 Best & Smith, 185, 197. Under the *Fairbank Case* an export document, to be protected against taxation, need not be a document absolutely necessary to the carrying on of the business. The charter party is a commercially necessary document, in view of the way in which business is actually done, and that being so, it is directly covered by the decision in the *Fairbank Case.*

MR. JUSTICE HUGHES delivered the opinion of the court.

This is a writ of error to review a judgment of the District Court awarding a recovery against the United States for the amount paid as stamp taxes upon certain charter parties under § 25 of the War Revenue Act of June 13, 1898, c. 448, 30 Stat. 448, 460. These charter parties were exclusively for the carriage of cargo from ports in the States of the United States to foreign ports and the imposition of the taxes was held to be in violation of § 9, Article I, of the Constitution of the United States, which provides: "No Tax or Duty shall be laid on Articles exported from any State."

The suit was brought under paragraph 20 of § 24 of the Judicial Code which confers jurisdiction, concurrent with the Court of Claims, upon the District Court 'of all claims not exceeding ten thousand dollars founded upon the Constitution of the United States or any law of Congress' (see act of March 3, 1887, c. 359, § 1, 24 Stat. 505); and the claim of the plaintiffs (defendants in error) was based upon the act of July 27, 1912, c. 256, 37 Stat. 240, which is as follows:

"That all claims for the refunding of any internal tax alleged to have been erroneously or illegally assessed or collected under the provisions of section twenty-nine of the Act of Congress approved June thirteenth, eighteen hundred and ninety eight, known as the War-Revenue Tax, or of any sums alleged to have been excessive, or in any manner wrongfully collected under the provisions of said Act may be presented to the Commissioner of Internal Revenue on or before the first day of January, nineteen hundred and fourteen, and not thereafter.

"SEC. 2. That the Secretary of the Treasury is hereby authorized and directed to pay, out of any moneys of the United States not otherwise appropriated, to such claimants as have presented or shall hereafter so present their

claims, and shall establish such erroneous or illegal assessment and collection, any sums paid by them or on their account or in their interest to the United States under the provisions of the Act aforesaid."

The Government demurred to the petition upon the grounds that the court had no jurisdiction of the defendant, or of the subject of the action, and that the petition did not state facts sufficient to the action, and that the petition did not state facts sufficient to constitute a cause of action. The demurrer was overruled (217 Fed. Rep. 680) and, after answer, the case was heard on the merits. The court found in substance that the firm, of which the defendants in error were the surviving members, had paid without protest certain stamp taxes on charter parties of the character described; that, on filing their claim under the act of 1912 it had been certified by the collector to be correct in its statement of facts, but that the Commissioner of Internal Revenue had rejected it for the reason that the act was not applicable. Holding the taxes to be unconstitutional, and the claim to have been duly presented, the court rendered judgment for the claimants.

The Government contends that the court erred in deciding (1) that the court had jurisdiction of the case, (2) that it need not be averred or proved that the tax was paid under protest, and (3) that the tax was invalid.

The first contention—with respect to jurisdiction—is that, the claim having been rejected, the remedy of the claimants was an action against the Collector of Internal Revenue and not against the United States. The course of the pertinent legislation since the passage of the War Revenue Act of 1898 may be briefly reviewed: In 1900, Congress provided for the redemption of, or allowance for, internal revenue stamps, including cases where 'the rates or duties represented thereby' had been 'excessive in amount, paid in error, or in any manner wrongfully collected.' Act of May 12, 1900, c. 393, 31 Stat. 177. In

1902, various provisions of the War Revenue Act, and amendments thereof, including §§ 6, 12, 25, schedules A and B, with regard to stamp taxes, and § 29 as to taxes on legacies and distributive shares, were repealed. Act of April 12, 1902, c. 500, 32 Stat. 96, 97. The repealing act was to take effect on July 1, 1902, and shortly before that date Congress made specific provision that certain taxes collected under the repealed statute should be refunded. Act of June 27, 1902, c. 1160, 32 Stat. 406. These taxes were (1) those that had been paid upon bequests for uses of a religious, literary, charitable, or educational character, etc.; (2) the 'sums paid for documentary stamps used on export bills of lading, such stamps representing taxes which were illegally assessed and collected'; and (3) taxes theretofore or thereafter paid upon legacies or distributive shares to the extent that they were collected 'on contingent beneficial interests' which had not become vested prior to July 1, 1902. It was also provided that no tax should thereafter be assessed under the act in respect of any such interest which had not become 'absolutely vested in possession or enjoyment' prior to the date mentioned.

The act of 1902 was followed by other refunding statutes. In *United States* v. *New York & Cuba Mail S. S. Co.*, 200 U. S. 488, suit had been brought in the District Court to recover taxes which had been paid under the War Revenue Act upon manifests of cargoes bound to foreign ports, and it was held (following *Chesebrough* v. *United States*, 192 U. S. 253) that no recovery could be had because the payment had been voluntarily made; the jurisdiction of the court was not impugned. Thereupon Congress provided for the refunding of sums paid for stamps "on export ships' manifests" representing taxes 'which were illegally assessed and collected,'—'said refund to be made whether said stamp taxes were paid under protest or not, and without being subject to any statute of limitations.' Act of March 4, 1907, c. 2919, 34 Stat. 1371,

1373. Again, in 1909, the Secretary of the Treasury was directed to pay to those who had duly presented their claims prior to July 1, 1904, the sums paid for stamps used 'on foreign bills of exchange' (drawn between July 1, 1898, and June 30, 1901) 'against the value of products or merchandise actually exported to foreign countries, such stamps representing taxes which were illegally assessed and collected, said refund to be made whether said stamp taxes were paid under protest or duress or not.' Act of February 1, 1909, c. 53, 35 Stat. 590; see also acts of August 5, 1909, c. 7, 36 Stat. 118, 120; June 25, 1910, c. 385, 36 Stat. 774, 779; August 26, 1912, c. 408, 37 Stat. 595, 626.

It thus appears that the act of 1912—upon which the present claim is based—was the culmination of a series of statutes which leave no question as to the intention of Congress to create an obligation on the part of the United States in favor of those holding the described claims, and it follows that these claims must be deemed to be founded upon a 'law of Congress' within the meaning of the provisions of the Tucker 'Act, now incorporated in the Judicial Code. See *Medbury* v. *United States*, 173 U. S. 492, 497; *McLean* v. *United States*, 226 U. S. 374, 378. With respect to the refunding of taxes paid on the 'contingent interests' described in the act of June 27, 1902, *supra*, it has been held that upon the rejection of the claim an action lies against the United States in the Court of Claims, or in the District Court (where the amount is within the prescribed limit). *Fidelity Trust Co.* v. *United States*, 45 Ct. Cl. 362; *S. C.*, 222 U. S. 158; *United States* v. *Jones*, 236 U. S. 106; *Thacher* v. *United States*, 149 Fed. Rep. 902; *United States* v. *Shipley*, 197 Fed. Rep. 265. And this is true not only where such taxes were paid before the refunding act was passed but also where subsequently they were wrongfully collected in violation of its provisions. *United States* v. *Jones, supra*. The same rule must obtain

as to all claims described in the act of 1912, and in this view we are not concerned in the present case with questions arising under the general provisions of the internal revenue laws.

It is urged by the Government that Congress intended to limit the act of 1912 to the refunding of death duties erroneously or illegally assessed under § 29 of the War Revenue Act. Reference is made to the legislative history of the statute, but the contention lacks adequate support. (See House Reports, 62d Cong. 2d Sess., Report No. 848, June 6, 1912.) While the pendency of claims for the refunding of such taxes may have induced the passage of the act its terms were not confined to these. On the contrary, after providing for the claims arising under § 29, Congress added the further clause making express provision for the presentation of claims for the refunding 'of any sums alleged to have been excessive, or in any manner wrongfully collected under the provisions of said Act'; and the Secretary of the Treasury is directed to pay to those who duly present their claims and establish the erroneous or illegal collection 'any sums paid by them . . . to the United States under the provisions of the Act aforesaid.' We are not at liberty to read these explicit clauses out of the statute.

Another objection to the jurisdiction of the District Court is that under § 5 of the Tucker Act (a provision which was saved from repeal by § 297 of the Judicial Code) the suit was to be brought 'in the district where the plaintiff resides.' 24 Stat. 506. The petition alleged that petitioners were the surviving members of a copartnership engaged in business in the City of New York 'within the district aforesaid' and that their 'business and partnership residence was and is in the Borough of Manhattan, City of New York, in said district.' It is said that the allegation was insufficient to show the residence required by the statute, but it does not appear that any such objection was

made in the court below. The general language of the demurrer with respect to jurisdiction had appropriate reference to the general authority of the court to entertain such a suit against the United States and to the jurisdiction of the subject-matter of the action. But assuming that the subject-matter was within the jurisdiction of the court the requirement as to the particular district within which the suit should be brought was but a modal and formal one which could be waived, and must be deemed to be waived in the absence of specific objection upon this ground before pleading to the merits. *St. Louis &c. Ry. v. McBride*, 141 U. S. 127, 131; *Central Trust Co. v. McGeorge*, 151 U. S. 129, 133; *Martin v. Balt. & Ohio R. R.*, 151 U. S. 673, 688; *Interior Construction Co. v. Gibney*, 160 U. S. 217, 220; *Western Loan Co. v. Butte & Boston Mining Co.*, 210 U. S. 368; *Arizona & New Mexico Ry. v. Clark*, 235 U. S. 669, 674.

It is also apparent, in the light of the manifest purpose and scope of the legislation to which we have referred, that the contention based upon the absence of protest cannot be sustained. Where taxes have been illegally assessed upon the 'contingent interests' described in the refunding act of 1902 it has been held that recovery may be had although the taxes were paid without protest. *United States v. Jones, supra*. In the acts of 1907 and 1909, *supra*, with respect to stamp taxes on "export ships' manifests" and on foreign bills of exchange against exports, Congress expressly provided for refunding whether the taxes had been paid under protest or not. The fact that these express words were not repeated in the act of 1912 cannot, in view of the nature of the subject, be regarded as evidencing a different intent; rather must this act receive in this respect the same construction as that which has been given to the act of 1902. If it appeared that the sums sought to be recovered were not legally payable, and the claim was duly presented within the time fixed, the right to

repayment was established by the express .terms of the statute.

The question, then, is whether the tax, so far as it was laid upon charter parties which were exclusively for the carriage of cargo from state ports to foreign ports, was a valid one. The constitutional provision that 'no tax or duty shall be laid on articles exported from any State' has been the subject of elaborate and authoritative exposition and we need but to apply the principles of construction which have been settled by previous decisions.

The prohibition relates only to exportation to foreign countries (*Woodruff* v. *Parham*, 8 Wall. 123; *Dooley* v. *United States*, 183 U. S. 151, 154, 162), and is designed to give immunity from taxation to property that is in the actual course of such exportation (*Pace* v. *Burgess*, 92 U. S. 372; *Turpin* v. *Burgess*, 117 U. S. 504; *Cornell* v. *Coyne*, 192 U. S. 418). This constitutional freedom, however, plainly involves more than mere exemption from taxes or duties which are laid specifically upon the goods themselves. If it meant no more than that, the obstructions to exportation which it was the purpose to prevent could readily be set up by legislation nominally conforming to the constitutional restriction but in effect overriding it. It was the clear intent of the framers of the Constitution that 'the process of exporting the products of a State, the goods, chattels, and property of the people of the several States, should not be obstructed or hindered by any burden of taxation.' Miller on the Constitution, p. 592. It was with this view that Chief Justice Marshall in *Brown* v. *Maryland*, 12 Wheat. 419,—holding that a state tax on the occupation of the importer was a tax on imports and that the mode of imposing it merely varied the form without varying the substance—drew the comparison between the two prohibitions: "The States are forbidden to lay a duty on exports, and the United States are forbidden to lay a tax or duty on articles exported

from any State. There is some diversity in language, but none is perceivable in the act which is prohibited. The United States have the same right to tax occupations which is possessed by the States. Now, suppose the United States should require every exporter to take out a license, for which he should pay such tax as Congress might think proper to impose; would the Government be permitted to shield itself from the just censure to which this attempt to evade the prohibitions of the constitution would expose it, by saying, that this was a tax on the person, not on the article, and that the legislature had a right to tax occupations?" *Id.*, pp. 444, 445. And in *Almy* v. *California*, 24 How. 169, applying the same principle, the court said by Chief Justice Taney that 'a tax or duty on a bill of lading, although differing in form from a duty on the article shipped' was 'in substance the same thing,' for 'a bill, of lading, or some written instrument of the same import,' was 'necessarily always associated with every shipment of articles of commerce from the ports of one country to those of another.' There, as was pointed out in *Woodruff* v. *Parham, supra,* shipments to foreign ports were not in fact involved, but this did not detract from the force of the statement so far as it concerns the effect of the tax described.

In *Fairbank* v. *United States*, 181 U. S. 283, the question of Federal taxation of export bills of lading was directly involved, and after great consideration was definitely determined. In that case, there had been a conviction under the War Revenue Act of 1898. It was the contention of the Government that no tax was placed upon the article exported; that so far as the question was as to what might be exported, and how it should be exported, the statute imposed no restriction; that the full scope of the legislation was to impose a stamp duty on a document not necessarily, though ordinarily, used in connection with the exportation of goods; that it was a mere 'stamp imposition

on an instrument' and similar to many such taxes which are imposed by Congress by virtue of its general power of taxation, not upon these alone, but upon a great variety of instruments used in the ordinary transactions of business. These arguments were not convincing. The court held that 'the requirement of the Constitution is that exports should be free from any governmental burden.' The language is 'no tax or duty.' 'We know historically,' said the court, 'that it was one of the compromises which entered into and made possible the adoption of the Constitution. It is a restriction on the power of Congress; and as in accordance with the rules heretofore noticed the grants of powers should be so construed as to give full efficacy to those powers and enable Congress to use such means as it deems necessary to carry them into effect, so in like manner a restriction should be enforced in accordance with its letter and spirit, and no legislation can be tolerated which, although it may not conflict with the letter, destroys the spirit and purpose of the restriction imposed.' In answer to the contention that the sole purpose of the prohibition was to prevent discrimination between the States, and that there should be enforcement only so far as necessary to prevent such discrimination, the court said: 'If mere discrimination between the States was all that was contemplated it would seem to follow that an *ad valorem* tax upon all exports would not be obnoxious to this constitutional prohibition. But surely under this limitation Congress can impose an export tax neither on one article of export, nor on all articles of export. In other words, the purpose of the restriction is that exportation, all exportation, shall be free from national burden.' The court found an analogy in the construction which had been given to the commerce clause in protecting interstate commerce from state legislation imposing direct burdens (*Robbins* v. *Shelby County,* 120 U. S. 489, 494); and legislative precedents for the tax were held

to be unavailing in view of the clear meaning and scope of the constitutional provision.

Following this decision, it was held by the District Court that the stamp tax on manifests of cargoes for foreign ports was invalid. These manifests were essential to the exportation. *New York & Cuba Mail S. S. Co.* v. *United States*, 125 Fed. Rep. 320. And while the case was determined in this court upon another ground, the correctness of this ruling as to the invalidity of the tax was conceded by the United States. 200 U. S. 488, 491.

Under this established doctrine, we are of the opinion that the tax upon these charter parties cannot be sustained. A charter party may be a contract for the lease of the vessel or for a special service to be rendered by the owner of the vessel. Where, as is very frequently the case, the ship owner undertakes to carry a cargo, to be provided by the charterer, on a designated voyage, the arrangement is in contemplation of law a mere contract of affreightment. By such a charter, the ship owner is the carrier of the goods transported by the ship, 'for the reason that the charter-party is a mere covenant for the conveyance of the merchandise or the performance of the stipulated service.' *Marcardier* v. *Chesapeake Ins. Co.,* 8 Cranch, 39, 49, 50; *Reed* v. *United States*, 11 Wall. 591, 600, 601; *Leary* v. *United States*, 14 Wall. 607, 610; *Richardson* v. *Winsor*, 3 Cliff. 395, 399; *The T. A. Goddard*, 12 Fed. Rep. 174, 178; 1 Parsons on Shipping, p. 278. The findings in the present case do not permit us to question the character of the charter parties here involved. It appears that the defendants in error, being ship brokers, engaged at various times the vessels respectively, which are named in the schedule attached to the findings, solely for the carriage of cargo from ports in the United States to the foreign ports specified; that is, we understand the findings to mean that these charters were for

described voyages on which 'cargoes of goods were to be, and were in fact, carried' to the places mentioned.

Instead of a contract for the carriage of a particular lot of goods occupying less than the entire cargo space, as in the case of an ordinary bill of lading, the charter party was a contract for the carriage of a full cargo lot. In legal principle, there is no distinction which can condemn the tax in the one case and save it in the other. Whether the contract of carriage covers a small lot, or a partial cargo, or an entire cargo—whether the goods occupy a part of the cargo space or the whole cargo space—can make no constitutional difference. The charters were for the exportation; they related to it exclusively; they serve no other purpose. A tax on these charter parties was in substance a tax on the exportation; and a tax on the exportation is a tax on the exports.

The Government urges the analogy of tonnage taxes or duties. The same argument was pressed unsuccessfully in the *Fairbank Case, supra,* p. 305. It should be observed that a tonnage tax, as it has been laid by the Federal Government from the beginning, is a tax on entry. 1 Stat. 135 (July 20, 1790, c. 30); Rev. Stat., § 4219; Acts Feb. 27, 1877, c. 69, 19 Stat. 240, 250; June 26, 1884, c. 121, § 14, 23 Stat. 53, 57; July 19, 1886, c. 421, § 11, 24 Stat. 79, 81. See *Transportation Co.* v. *Parkersburg,* 107 U. S. 691, 696. A duty of tonnage under Article I, § 10, of the Constitution, has been described as a charge 'for entering or leaving a port' (*Huse* v. *Glover,* 119 U. S. 543, 549), but Congress has not attempted to impose a tonnage tax for the privilege of leaving a state port for a foreign port and we have no occasion to consider the question of the validity of such a tax. Again, it is contended that the tax bore only incidentally upon exportation. It was to be paid on all charter parties of vessels having a 'registered tonnage.' But, aside from any question as to the scope of this provision, the tax as

applied to the charter parties here in question was nothing else than a tax on exportation and to this extent was in any event invalid. The same principle governs that has constantly been held to obtain in cases where it has been sought to give effect to taxes upon interstate commerce under general legislation of the States. In *Robbins* v. *Shelby County, supra,* it was strongly urged, 'as if it were a material point in the case,' that no discrimination was made 'between domestic and foreign drummers'— that is, between those of the State whose legislation was in question and those of other States; that all were taxed alike. But the court held that this did not meet the difficulty, inasmuch as interstate commerce could not 'be taxed at all, even though the same amount of tax should be laid on domestic commerce.' This had been decided, as the court pointed out, in the case of *The State Freight Tax,* 15 Wall. 232; and it has become one of the commonplaces of constitutional law. See *Brennan* v. *Titusville,* 153 U. S. 289, 304; *Caldwell* v. *North Carolina,* 187 U. S. 622, 629; *Rearick* v. *Pennsylvania,* 203 U. S. 507, 510; *Crenshaw* v. *Arkansas,* 227 U. S. 389. We know of no ground upon which a different effect can be given to the explicit constitutional provision which denies to Congress the right to tax exportation from the States.

There is a further objection that the goods were not on the vessel at the time the charter party was made, but as the charters related only to the exportation this objection is plainly without merit.

The judgment of the District Court is affirmed.

*Judgment affirmed.*

MR. JUSTICE McREYNOLDS took no part in the consideration and decision of this case.