# THE COMMERCE.

## THE DAUNTLESS NO. 6.

## In re HOWARD.

## In re PORT JEFFERSON TRANSP. CO.

District Court, S. D. New York.
July 17, 1941.

Affirmed, 130 F.2d 354.

Joseph M. Howard, of New York· City (Edmund F. Lamb, of New York City, of counsel), for petitioner and claimant, Thomas J. Howard.

Hill, Rivkins & Middleton, of New York City (Thomas H. Middleton, of New York City, of counsel), for claimant, New England Steamship Co.

Pyne & Lynch, of New York City (Anthony V. Lynch, of New York City, of counsel), for petitioner, Port Jefferson Transp. Co.

CLANCY, District Judge.

These are limitation proceedings instituted by Thomas J. Howard, owner of the sunken barge Commerce, and by the Port Jefferson Transportation Company, a Delaware corporation, owner of the tug Dauntless No. 6 which was towing the Commerce, laden with coal, owned by the New England

Steamship Company. The New England Steamship Company has filed claims in both proceedings and the petitioner, Howard, has filed a claim in the Port Jefferson Transportation Company proceeding for damage resulting from the loss of the Commerce.

On September 19, 1939, the petitioner, Thomas J. Howard, and the claimant, New England Steamship Company, entered into a written agreement for the petitioner's transportation of coal from South Amboy, New Jersey, to New Bedford, Massachusetts, at 95 cents per gross ton. On September 23, in accordance with this agreement, the Commerce was loaded with 941 tons of coal at South Amboy and its bargee, Berry, executed a receipt therefor and agreeing to discharge it to Nantucket and Martha's Vineyard Steamship Company at New Bedford, Massachusetts, thus identifying the shipment as the one contracted for on September 19th. On September 24th, the Commerce was taken in tow off Erie Basin by the Dauntless No. 6. The Commerce was a box type barge built in 1919, 114 feet, 4 inches long, 32 feet abeam and 16 feet 4 inches to her sides. Her capacity was twelve hundred gross tons; her freeboard on this voyage was 5 feet at the bow, 3 feet amidships and 4 feet 6 inches at the stern. She carried three power pumps and two hand pumps. Two of the power pumps were located at the stern, one on the starboard corner and the other on the port corner. She was also equipped with wooden hatch covers one and a half inch thick. These covers rested on three strongbacks and were clamped down on the edges of the coaming which was approximately 3 feet above deck so that the low edge of the covers was about 7 feet above the water.

The tow proceeded up the East River into Long Island Sound. Upon passing Execution Light, the hawsers were lengthened out to 120 fathoms with an extra 45 feet for the bridles. The voyage continued without incident. New London was passed on September 25th at 4:30 P.M., where the United States Coast Guard Station at Fishers Island, at 4 P.M., reported cloudy weather with a southwest wind of 18-22 statute miles and a barometer of 29.90. Point Judith was abreast at approximately 11 P.M., where and when the United States Coast Guard Station reported the same wind velocity with a fall in the barometer of 0.12 and clear weather.

Berry testified that at this point the sea became a little choppy and occasional spray was cast on deck. Newport, Rhode Island, was passed at 12 Midnight. The nearby Coast Guard Station at Brenton Point reported the same conditions as at Point Judith with a barometer rise of 0.38. Berry testified that after 12:30 A.M. on the 26th, solid water was coming over the hatches continuously on the starboard side. Sakonnett River was abeam at about 2 A.M. The Hen and Chickens Station—Lightship No. 106—reported for 12 Midnight, a southwest breeze of 18-22 statute miles with a smooth sea and a barometer of 29.87 and at 4 A.M. a southwest breeze of 18-22 statute miles with a choppy sea and a barometer of 29.84. Berry's testimony went on that at this time three of the hatch coverings were smashed in, giving entry to the water into the hold of the barge, whereupon, he started his power pump on the port stern corner, the starboard pump having become entirely useless due to continuous wetting. The port pump was located on that side of the cabin. It was covered by a wooden hatch which, in turn, was attached to the side of the cabin by means of hooks and eyelets. The barge continued to take water so he signalled the tug which shortly circled back to the barge's port stern quarter, standing off about 10 to 15 feet. Berry states that he informed the tug that he was "leaking badly" and had 25 inches of water in the hold and suggested that they put into a lee of Sakonnett River, a distance of about 9 to 12 miles, depending on where one would place the first available lee, but instead, the tug made for the lee of Penikese Islands in Buzzards Bay, a distance of about 11 to 12 miles. The bargee claims solid water continued to come over the hatches and its wash on the deck caused the power pump's hatch to go overboard and wetted the pump, causing it to stop. One hour after his first signal and at 3 A.M. he again signalled the tug and he and his wife went aboard the tug, it having thrown a line to the bargee and come up next to the barge with its stern at the latter's port bow, whereupon they both jumped aboard, he carrying a suitcase and one of them a big paper bag full of their possessions. The tug's course was again laid for Buzzard's Bay and at 4:15 A.M. the barge sank with its cargo.

■ The agreement of September 19th is in writing, signed by both parties and

362

contains all the essential elements of a charter party. By its terms the ship owner undertook to carry a cargo to be provided by the charterer on a designated voyage. Thus the arrangement is a contract of affreightment. United States v. Hvoslef, 237 U.S. 1, 35 S.Ct. 459, 460, 59 L.Ed. 813, Ann.Cas.1916A, 286; Reed v. United States, 11 Wall. 591, 78 U.S. 591, 20 L.Ed. 220. The mere fact that the contract is set forth on claimant's "buyer's order" form which has terms and conditions on the reverse side, having nothing to do with water transportation, in no way detracts from its sense. The use of the form was a matter of convenience.

■ It is settled law that in the absence of an expressed modification, there is an absolute implied warranty of seaworthiness. Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012; Cullen Fuel Co. v. Hedger, Inc., 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189. The petitioner, Howard, attempts to introduce parol evidence of a modification of this warranty on the theory that there was no written contract between the parties. We have found this not to be the fact and, under the parol evidence rule, when a contract by its terms imports a complete legal obligation with no uncertainty as to the object or extent of the engagement, it is, in the absence of fraud, accident or mistake, conclusively to be presumed that the entire agreement is stated in it. Seitz v. Brewers' R. M. Co., 141 U.S. 510, 12 S.Ct. 46, 35 L.Ed. 837; De Witt v. Berry, 134 U.S. 306, 10 S.Ct. 536, 33 L.Ed. 896. Consequently, the claimant's objection to petitioner, Howard's, testimony as to additional oral provisions is sustained and that testimony is stricken out. The objection to the introduction of admissions by Mr. and Mrs. Berry is also sustained. May Queen, 1931 A.M.C. 488, affirmed 2 Cir., 49 F.2d 1082; Luby v. Hudson River R. Co., 17 N.Y. 131.

The witnesses are all in agreement that the weather prevailing throughout the voyage was normal and reasonably to be expected. The United States Coast Guard Stations along the course taken by the tow all report a southwest breeze of 18-22 statute miles an hour, justifying a finding that the tow was not subjected at any time to a peril of the sea or any "vis major". The log of the tug Eureka with the coastwise barge Samuel C. Loveland, Jr., in tow, having proceeded over the same course as taken by the Commerce, at about one hour before, reports clear weather and a moderate southwest wind from 7:10 P.M. on September 25, at Watch Hill until 3:40 A.M. on September 26, at Buzzard's Bay.

■ The Supreme Court has laid down as the test for seaworthiness: "Whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." The Southwark, 191 U.S. 1, 24 S.Ct. 1, 3, 48 L.Ed. 65; The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; Franklin Fire Ins. Co. v. Royal Mail Steam Packet Co., 2 Cir., 38 F.2d 175. The barge owner's explanation of her sinking is that the crash of heavy seas broke the hatch covers, thus introducing water into the hull. If this be the fact, the conclusion of unseaworthiness when the Commerce broke ground is inevitable. Since the vessel sank, her owner's explanation cannot be absolutely denied but we find it difficult to believe that the hatch covers, if they broke, were of seaworthy strength and quality. There is expert testimony in the case that only a wind of not less than gale force can fracture seaworthy hatch covers. On the night the barge sank, the entire coast in that neighborhood reported a moderate breeze not exceeding 22 miles an hour, with the exception of the steamship New York which recorded a wind of force 5, Beaufort Scale, and that does not exceed 28 statute miles an hour. How a wind is exactly recorded on a moving vessel was not explained but we will accept it anyway and note that it was reported at 11 P.M. on September 25th at the Hen and Chickens Light Vessel which itself reported a southwest breeze of 18 to 22 miles at Midnight. The bargee's wife testified that prior to boarding the tug she placed her suitcase on one of the hatch covers at the port bow and that it remained there for two or three minutes, although she first said that it was placed there "long before". Both wind and sea were quartering in the direction of the port bow and if green water was breaking on the starboard hatches, we are unable to understand how a suitcase rested on the port side at all. And, assuming that a tug would be so rash as to approach within a foot of her barge in such a sea as the occupants of the barge described, which we do not believe, we think the transition from one vessel to another would be very unlike the action reported by the bargee's wife. She did

not jump into the arms of the tug's crew but was handed down by them. Even as the record reads now, the getting aboard the tug seems impossibly simple. Neither the bargee nor his wife, in their testimony, indicated any recollection of fright or a sense of danger when the leap occurred and we think that their testimony in this regard indicates a gross exaggeration of both wind and sea conditions prevailing at the time. The bargee even carried a suitcase as he made his leap. The only other witnesses were the tug's crew. Its deckhand, now hospitalized for an injury whose effects were quite apparent in his testimony and manner, said that high seas were coming aboard the tug's stern after passing Point Judith. He had testified to the contrary before the local inspectors and even at the trial said he was sitting on the gavel of the bitt at times, despite the high seas he described.

As against all this, the petitioner, Howard, offered no testimony to sustain a finding of seaworthiness for the hatch covers which broke approximately one hour after they were subjected to the stress of a choppy sea nor even made a real effort to establish any diligence on his part in providing seaworthy hatch covers. He rests his argument on the fact that a large portion of the voyage was completed without difficulty but we do not understand how any conclusion can be drawn from that fact since the calm waters of Long Island Sound offered no test of their ability to withstand the rigors of the contemplated open portion of the voyage.

Proof was offered at the trial that leakage in the barge's seams was a contributing, if not the sole, factor in the sinking. The evidence shows that the Commerce, on her previous voyage on August 26th, was improperly loaded so that she was strained and leaked and partly sank on a mud bank with 3 feet of water in her hull. She was hauled and underwent repairs which consisted of installing three short pieces of bottom planking, partial respiking and recaulking of her bottom and ends up to her light water line. William Howard has testified that he tested the caulking "as far as I could reach." Thomas Howard testified that caulking above the light water line lasts approximately four years yet no evidence was offered showing previous caulking above the light water line. The bargee testified that on the previous trip leakage occurred on the port stern corner which was stopped by inserting cakum with a knife blade from inside the lazaret. However, nothing was done to correct this defect at the time of drydocking as the outer lip of the seam was claimed to have been found secure by William Howard if it be concluded that his casual test touched this seam at all. Upon this evidence it might seem that the Commerce was unseaworthy in respect to her seams above the light water line and this might have been the sole cause of or a contributing factor in the sinking. But, inasmuch as the true cause of the sinking of the Commerce is known only by the bargee and his wife, if it be known at all, we are unable to find as a fact, in the absence of other evidence, that this was a real factor. It is admitted that the barge was acting as a private carrier and as such was in the position of a bailee. "It is well settled that the burden rests upon the bailor to prove some breach of duty by the bailee other than his mere failure to return." Commercial Molasses Corp. v. New York Tank Barge Corp., 2 Cir., 114 F.2d 248, 251, and cases there cited. The claimant here has demonstrated that the hatch covers developed a defect which can only be accounted for, in the light of all the evidence, by a finding of their unseaworthiness at the commencement of the voyage. This conclusion is a rational inference and the petitioner, Howard, has failed to meet it with sufficient evidence, if, indeed, any at all. On all the evidence, we find, therefore, that if as the barge owner petitioner says, the breaking of his hatch covers by the action of the sea was the cause of his boat filling and sinking, that she was unseaworthy in respect to those covers when the voyage began, and that he is entitled to neither limitation nor exoneration.

The claimant, New England Steamship Company, and the petitioner, Thomas J. Howard, have filed claims in the limitation proceedings of the Port Jefferson Transportation Company, alleging negligence of the tug Dauntless No. 6 in not putting into the Sakonnett River upon first being apprised of the condition of the Commerce.

The first distress signal was given on September 26th at 2 A.M. when the tow was approximately 9 to 12 miles from a safe anchorage in the Sakonnett River. It was approximately 11 to 12 miles west of a lee under the Penikese Island. The only evidence is, if we accept it, that at

that time the Commerce's pump was operating and she had about 25 inches of water in her hull. The wind was southwest and there was a favoring flood tide on its quarter when proceeding on an easterly course. In view of these facts, we find the tug free of any negligence in failing to make for the Sakonnett River. Neither the barometer readings nor the weather report received over the tug's radio prior to the sinking indicated any need of making for a port of refuge. In fact, we concur in the tug captain's choice of refuge. The wind and tide were more favorable; the distance was not appreciably greater, if at all; and the course safer in view of the fact that there was a rocky condition existent at the mouth of the Sakonnett, making navigation more exacting. Expert navigators in that locale have differed during the trial on the wisdom of making for these points of refuge, indicating to us that it was a matter of judgment for the exercise of which, in the absence of any evidence of negligence, one may not be held liable. There is evidence in the case that two tows put in at New London solely because of the unfavorable wind conditions but we refuse to accept their judgment as a criterion of due care for we note that they put out again in a stronger wind.

Judgment is, therefore, rendered in favor of the claimant, New England Steamship Company, against the petitioner, Thomas J. Howard, and his petition for limitation of liability is denied. The Port Jefferson Transportation Company is exonerated of all liability.