GORSUCH, Circuit Judge,
concurring.
I write separately because, to my mind, the plain language of 28 U.S.C. § 1346(a)(1) compels our decision to reverse. Section 1346(a)(1) gives district courts the power to hear:
[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.
Accordingly, there are only two ways the district court could’ve lawfully asserted jurisdiction under § 1346(a)(1) to entertain Wyodak’s refund claim: if SMCRA qualifies as an “internal-revenue law” or if SMCRA’s reclamation fee constitutes an “internal-revenue tax.”[1] As it happens, neither of these conditions holds true, and so I agree with my colleagues that the Court of Claims, not the district court, is the appropriate forum for resolving this dispute.
To explain why this is so, I begin by examining what the terms “internal-revenue tax” and “internal-revenue law” do and do not encompass as a matter of their plain meaning. I then turn to assess whether SMCRA’s reclamation fee falls within either.
I
Beginning with the phrase “internal-revenue law,” it turns out that each of those words had a specific and nuanced meaning when Congress wrote them into § 1346(a)(1)’s predecessor, the Revenue Act of 1921. See Flora v. United States, 357 U.S. 63, 65, 70, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958) (noting that interpretation of § 1346 turns on the meaning of these terms in 1921). Then (like now), there was substantial disagreement about the distinction between constitutionally permissible taxes on internal activity (allowed by Article I, § 8) and constitutionally impermissible taxes on exports (enjoined by Article I, § 9). See, e.g., United States v. Hvoslef, 237 U.S. 1, 13, 35 S.Ct. 459, 59 L.Ed. 813 (1915); Thames & Mersey Marine Ins. Co. v. United States, 237 U.S. 19, 25, 35 S.Ct. 496, 59 L.Ed. 821 (1915); A.G. Spalding & Bros. v. Edwards, 262 U.S. 66, 43 S.Ct. 485, 67 L.Ed. 865 (1923); United States v. Int’l Bus. Machs. Co., 517 U.S. 843, 846-49, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996). And then (like now), there was a brewing dispute over the role of Congress’s taxing power, particularly whether certain congressional actions taking the guise of taxes were actually regulations aimed at controlling private *1137 behavior — and, if so, whether those actions exceeded Congress’s regulatory authority. See, e.g., Pace v. Burgess, 92 U.S. 372, 376, 23 L.Ed. 657 (1875); Helwig v. United States, 188 U.S. 605, 610-11, 23 S.Ct. 427, 47 L.Ed. 614 (1903); Lipke v. Lederer, 259 U.S. 557, 561-62, 42 S.Ct. 549, 66 L.Ed. 1061 (1922); Hill v. Wallace, 259 U.S. 44, 67-69, 42 S.Ct. 453, 66 L.Ed. 822 (1922); Florida ex rel. McCollum v. U.S. Dep’t of Health and Human Svcs., 716 F.Supp.2d 1120, 1130 (N.D.Fla.2010).
The distinctions along these two axes— between internal and external taxes, on the one hand, and between revenue-raising taxes and regulatory fees, on the other— often bore great consequence. Because of the constitutional constraints on Congress’s regulatory power, hard-won social legislation often could survive constitutional review only if it could convincingly invoke Congress’s taxing authority. See, e.g., Child Labor Tax Case, 259 U.S. 20, 37-38, 42 S.Ct. 449, 66 L.Ed. 817 (1922) (penalty for employing child labor was not a tax). At the same time, avoiding the “tax” category could be critical for complying with the Export Clause. See, e.g., Pace, 92 U.S. at 375-76 (tobacco stamp fee not an unconstitutional tax on exports). Congress was surely aware of these contemporaneous contests over the scope of its taxing and regulatory powers. And by choosing the term “internal-revenue tax,” the Legislature sought to pick a side in and play off of both distinctions: internal as opposed to external; tax as opposed to fee. Here, of course, there’s no question that SMCRA applies internally. But much hinges on whether SMCRA is properly understood as levying a tax or imposing a regulatory fee.
At the time Congress invoked this tax-fee distinction to limit the jurisdiction of the district courts in § 1346(a)(l)’s predecessor statute, the difference between a tax and a fee turned largely on legislative purpose. If a law’s purpose was to regulate private behavior, the costs imposed by it were treated as fees — and so required justification under the legislature’s regulatory authority. See 1 Thomas M. Cooley, The Law of Taxation § 27 (4th ed. 1924) (“Duties, excises and license laws, having for their object the common benefit and protection, and designed for the prevention or mitigation of evils, are not acts of taxing power.”); Hill v. Kemp, 478 F.3d 1236, 1244 (10th Cir.2007) (noting distinction between tax and fee turned on purpose of the assessment and the use to which the proceeds were put); see, e.g., Rhinehart v. State, 121 Tenn. 420, 117 S.W. 508, 512-13 (1908) (holding fee on insurance contracts to create fund for investigating fires was not a tax). Meanwhile, a charge imposed for the purpose of raising general revenue was a tax, and so needed to be consistent with the sovereign’s authorized taxing powers. See Cooley, supra, § 27 (“If revenue is the primary purpose, the imposition is a tax.”); State ex rel. Wyatt v. Ashbrook, 154 Mo. 375, 55 S.W. 627, 629 (1900) (department-store license fee was a tax because it bore no relation to the preservation of the public health, morals, safety, or welfare); Village of Lemont v. Jenks, 197 Ill. 363, 64 N.E. 362, 364 (1902) (suicharge on public water supply was a tax because it was imposed for the purpose of raising revenue). The legislature’s choice of the word “tax” or “fee” might be indicative of a bill’s purpose, but courts were willing to — and often did — look beyond the title of the act to discern the legislature’s intentions. See Cooley, supra, § 37; Child Labor Tax Case, 259 U.S. at 39, 42 S.Ct. 449; Wyatt, 55 S.W. at 629.
The phrase “internal-revenue law” also carried a well-established meaning in 1921. In fact, the term “revenue law” had long been used to circumscribe the jurisdiction of federal courts. For example, Congress used the expression “revenue law” back in *1138 1844 when it sought to expand the Supreme Court’s jurisdiction over tax appeals. Beginning in that year, the Supreme Court could hear certain appeals without regard to the amount in dispute, but only when it came to civil actions “for the enforcement of the revenue laws of the United States.” Act of May 31, 1844, 5 Stat. 658; United States v. Hill, 123 U.S. 681, 684-85, 8 S.Ct. 308, 31 L.Ed. 275 (1887). And, even farther back, Congress had granted circuit courts removal jurisdiction over suits against officers of the United States, but only if the officer’s disputed conduct was under the color of “the revenue laws.” See Act of Mar. 2, 1833, ch. 57, § 3, 4 Stat. 633; Cleveland, C. C. & I. R. Co. v. McClung, 119 U.S. 454, 460-61, 7 S.Ct. 262, 30 L.Ed. 465 (1886).
Given this history, it shouldn’t come as a surprise that federal courts had the chance to define the term “revenue law” by 1921. As it turns out, the Supreme Court had done so unequivocally and more than thirty years earlier:
[T]he term “revenue law,” when used in connection with the jurisdiction of the courts of the United States, means a law imposing duties on imports or tonnage, or a law providing in terms for revenue; that is to say, a law which is directly traceable to the power granted to congress by section 8, art. 1, of the constitution, “to lay and collect taxes, duties, imposts, and excises.”
Hill, 123 U.S. at 686, 8 S.Ct. 308 (1887); see also United States v. Mayo, 26 F. Cas. 1230, 1231 (C.C.Mass.1813) (Story, J.) (defining revenue laws as “such laws as are made for the direct and avowed purpose for creating and securing revenue or public funds for the service of the government”).
Given this definition, the relationship between the two prongs of § 1346(a)(1) turns out to be quite straightforward: an internal-revenue lato is a law that enacts an internal-revenue tax. See Cooley, supra, § 12 (“Any law which provides for the assessment and collection of a tax to defray the expenses of government is a revenue law.”) (internal quotation marks omitted). So, the present question of jurisdiction under § 1346(a)(1) turns out to be a relatively simple one: We need only determine whether the law at issue was enacted pursuant to Congress’s power to tax or its power to regulate.
II
With this understanding of § 1346(a)(l)’s plain language in mind, it becomes quickly evident that Congress was exercising its regulatory authority when it passed SMCRA. The first clue comes from the declarations found in SMCRA itself. The statute’s announced purpose is “to provide for cooperation between the Secretary of the Interior and the States with respect to the regulation of surface coal mining operations, and the acquisition and reclamation of abandoned mines, and for other purposes.” Pub.L. No. 95-87, 91 Stat. 445 (1977). These “other purposes” turn out to be many but exactly none involves the raising of revenue. See 30 U.S.C. § 1202. What’s more, Congress went to great lengths to note the effects of surface mining on interstate commerce, see 30 U.S.C. § 1201, and even limited certain provisions so that SMCRA would not exceed Congress’s authority to regulate interstate commerce, see 30 U.S.C. § 1291(3) & (28)(A) — none of which would have been necessary, of course, if Congress had simply wanted to pass a tax. And, if that weren’t a clear enough indication of the Legislature’s idea, Congress used the term “fee” consistently and throughout SMCRA. Emphatic in its silence, SMCRA contains not a single reference to any federal tax.
Neither does this appear to have been a failure of vocabulary. To the contrary, *1139 SMCRA stands in stark and telling contrast with another bill the same Congress passed just six months later, the “Black Lung Benefits Revenue Act of 1977,” Pub.L. No. 95-227, 92 Stat. 11, codified at 26 U.S.C. § 4121 et seq. The purpose of that Act, Congress proclaimed, was to “impose an excise tax on the sale of coal.” Id. And it gets right to the point in doing so: “There is hereby imposed ... a tax.” Id. at § 2(a). The name of the act, its declared purpose, and its unequivocal use of the word “tax” leave little of Congress’s intent to question. When it came to invoking its taxing power to raise revenue from mining operations, Congress generally, and the 95th Congress in particular, plainly knew how to do so.
Looking beyond form to substance only confirms that SMCRA is an act of regulation, not taxation. SMCRA’s objective is plainly to “protect the environment” by “assuring] that adequate procedures are undertaken to reclaim” surface mines. See 30 U.S.C. § 1202(d), (e). In service of this goal, SMCRA imposes a fee on coal mining and commands that the resulting funds be used to reduce and repair the damage caused by mining activities. See 30 U.S.C. § 1232(g). Some portion of the collected fees goes towards remedying past harms — principally reclaiming surface mines abandoned prior to 1977. See §§ 1232(g)(1), 1232(g)(3)(C), 1233(a)(1), and 1234. The balance of the collected fees goes to avoiding new mining-related harms — funding emergency reclamation projects, see §§ 1232(g)(3)(B) & 1240, subsidizing the costs of complying with the regulation incurred by certain small-scale producers, see §§ 1232(g)(3)(A) & 1257(c), and offsetting the expense of administering SMCRA itself, see § 1232(g)(3)(D). But for all SMCRA does, providing for the general revenue it does not. No portion of the assessment goes into the general bourse, or, for that matter, towards any purpose other than ameliorating harms caused by the mining industry. Cf. Hill v. Kemp, 478 F.3d at 1246 (specialty license plate program was a tax because proceeds went to a wide array of public purposes unrelated to the assessed activity).
Assessments of this sort, imposed on particular groups to offset the public welfare harms their activities cause, were (at least in 1921) well-recognized as an exercise of the sovereign’s regulatory, not taxing, authority. See Cooley, supra, § 28 (the police powers include the authority to levy fees on industries due to their “special relation to property ... or to business peculiarly troublesome or dangerous”); People v. Van Horn, 46 Mich. 183, 9 N.W. 246, 247 (1881) (dog license fee was not a tax because proceeds were reserved to compensate local sheep owners for dog-related damage). In this case, Congress found that many mining operations cause environmental harms that “adversely affect commerce and the public welfare.” See 30 U.S.C. § 1201(c). SMCRA merely allocates the cost of remedying those harms to the industry responsible for them — a classic use of regulatory authority to protect the public welfare.
To be sure, for some of the time relevant to this litigation, the Secretary of the Interior was authorized to transfer the interest earned on the reclamation fees (and potentially a small amount of the fees themselves) to the United Mine Workers of America Combined Benefit Fund. See “Energy Policy Act of 1992,” Pub.L. 102-486, § 19143, 106 Stat. 2776, 3056. But even here the Secretary was permitted to do so only for the purpose of funding the pension benefits of retired miners — itself an effort to coordinate settlement of the industry’s collective liabilities, not to enhance the general revenue. Besides and what’s more, even if Congress had steered a modest portion of excess reclamation fees to other, completely unrelated projects, that *1140 would not suffice to make their primary-purpose revenue-raising or otherwise convert them into taxes under the accepted meaning of the term in 1921. See Cooley, supra, § 27 (“If the primary purpose of the legislative body in imposing the charge is to regulate, the charge is not a tax even if it produces revenue for the public.”); Rhinehart, 117 S.W. at 513 (“The provision that [ ] any surplus of the charge ... shall be paid into the state treasury, does not make that charge a tax for revenue.”).[2]
Under the plain meaning of § 1346(a)(1), then, SMCRA isn’t a revenue law. And its reclamation fee isn’t a tax. Accordingly, the district court had no jurisdiction under § 1346(a)(1) to hear Wyodak’s lawsuit disputing its SMCRA assessment, and Wyodak’s lawsuit should’ve been heard, if at all, only in the Court of Claims. For this reason, I join the majority in remanding this case to the district court with instructions to dismiss it.

. Arguably, "any penalty claimed to have been collected without authority” creates an additional route to jurisdiction, one that does not require a relationship to either “internal-revenue taxes” or "internal-revenue laws.” Even assuming as much, however, does not change the result, because at no point in this litigation has Wyodak asserted that the reclamation fee is a penalty collected without authority.

. Although the district court stated that “a plethora of decisions” had found SMCRA's coal reclamation fee to be a tax, in fact many of the cases the district court cited do not actually decide whether SMCRA's assessment is a tax or a fee. For example, United States v. Tri-No Enters., Inc. merely held that the reclamation fee was not a “civil fine, penalty, or forfeiture” for the purposes of a statute of limitations. 819 F.2d 154, 158 (7th Cir.1987). A penalty, of course, is neither a tax nor a fee — and as such the Seventh Circuit didn't have any reason to consider the question. In fact, only two of the cases cited by the district court seem to have actually decided whether SMCRA imposes a tax or a fee. Though they both concluded it was a tax, however, neither did so for purposes of § 1346(a)(1). See United States v. River Coal, Co., 748 F.2d 1103, 1106-07 (6th Cir.1984) (reclamation fee not discharged under the repealed Bankruptcy Act of 1976); Consolidation Coal Co. v. United States, 64 Fed.Cl. 718, 732 (Fed.Cl.2005), reversed and remanded on other grounds, 528 F.3d 1344 (Fed.Cir.2008) (reclamation fee a "tax” for purposes of the Export Clause). What's more, neither discussed the well-recognized principle that a valid regulatory fee could be imposed on dangerous activities to offset the cost of protecting the public from any resulting harms. But, as the question before us is limited to the scope of § 1346(a)(1), I express no opinion as to whether this common law principle, though certainly forceful in 1921, is relevant to the interpretation of the word “tax” in other contexts.