## RICHFIELD OIL CORP. *v.* STATE BOARD OF EQUALIZATION.

No. 46. Argued October 24, 1946.—Decided November 25, 1946.

70

*Norman S. Sterry* argued the cause for appellant. With him on the brief was *Robert E. Paradise.*

*John L. Nourse,* Deputy Attorney General of California, argued the cause for appellee. With him on the brief was *Robert W. Kenny,* Attorney General.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case is here on appeal from the Supreme Court of California which sustained a California tax against the claim that it was repugnant to Article I, Section 10, Clause 2 of the Constitution of the United States. Judicial Code § 237, 28 U. S. C. §§ 344 (a), 861a.

Appellant is engaged in producing and selling oil and oil products in California. It entered into a contract with the New Zealand Government for the sale of oil. The price was f. o. b. Los Angeles, payment in London. Delivery was "to the order of the Naval Secretary, Navy Office, Wellington, into N. Z. Naval tank steamer R. F. A. 'Nucula' at Los Angeles, California." The oil was to be consigned to the Naval-Officer-In-Charge, Auckland, New Zealand. Appellant carried the oil by pipe line from its refinery in California to storage tanks at the harbor where the Nucula appeared to receive the oil. When the Nucula had docked and was ready to receive the oil, appellant pumped it from the storage tanks into the vessel. Customary shipping documents were given the master, including a bill of lading which designated appellant as shipper and consigned the oil to the designated naval officer in Auckland. Payment of the price was made in London. The oil was transported to Auckland, no portion of it being used or consumed in the United States. Appellant filed with the Collector of Customs a shipper's export declaration. It did not collect, nor attempt to do so, any sales tax from the purchaser. Appellee assessed a retail sales tax against appellant meas-

ured by the gross receipts from the transaction. The tax was paid under protest, a claim for refund was filed asserting that the levy of the tax violated the provisions of Article I, Section 10, Clause 2 of the Constitution of the United States, and this suit was brought to obtain a refund. The California Supreme Court, one justice dissenting, first allowed a recovery on that ground. 155 P. 2d 1. After a rehearing it reversed its position and held the tax constitutional, two justices dissenting. 27 Cal. 2d 150, 163 P. 2d 1.

I. We are met at the outset with the question whether the judgment of the California Supreme Court is a "final judgment" within the meaning of the Judicial Code § 237, 28 U. S. C. § 344 (a). The case was tried on the pleadings and stipulated facts, a jury having been waived. The trial court found for appellant. The Supreme Court ordered that the judgment "be and the same is hereby reversed." The argument is that under California law where a judgment has been reversed without directions, there is a new trial; that on a new trial appellant might amend its complaint and produce other evidence; and that if a new trial were had, new or different findings of fact might be made. See *Erlin* v. *National Union Fire Ins. Co.,* 7 Cal. 2d 547, 61 P. 2d 756.

The designation given the judgment by state practice is not controlling. *Department of Banking* v. *Pink,* 317 U. S. 264, 268. The question is whether it can be said that "there is nothing more to be decided" (*Clark* v. *Williard,* 292 U. S. 112, 118), that there has been "an effective determination of the litigation." *Market Street Ry. Co.* v. *Railroad Commission,* 324 U. S. 548, 551; see *Radio Station WOW* v. *Johnson,* 326 U. S. 120, 123–24. That question will be resolved not only by an examination of the entire record (*Clark* v. *Williard, supra*) but, where necessary, by resort to the local law to determine what effect the judgment has under the state rules of practice. *Brady* v.

*Terminal Railroad Assn.*, 302 U. S. 678; *Brady* v. *Southern Ry. Co.*, 319 U. S. 777. See Boskey, Finality of State Court Judgments under the Federal Judicial Code, 43 Col. L. Rev. 1002, 1005.

This suit is brought under the California Retail Sales Tax Act, § 23 and § 31, which prescribes the sole remedy for challenging the tax. The procedure prescribed is payment of the tax, the filing of a claim for refund which sets forth "the specific grounds upon which the claim is founded," Cal. Stats. 1941, pp. 1328, 1329, and, in case the claim is denied, the institution of a suit within ninety days "on the grounds set forth in such claim." Cal. Stats. 1939, pp. 2184, 2185. The claim thus frames and restricts the issues for the litigation. Although the Supreme Court reversed the judgment of the trial court without direction, its decision controls the disposition of the case. See *Estate of Baird*, 193 Cal. 225, 223 P. 974; *Bank of America* v. *Superior Court*, 20 Cal. 2d 697, 128 P. 2d 357. Since the facts have been stipulated [1] and the Supreme Court of California has passed on the issues which control the litigation, we take it that there is nothing more to be

---

[1] In California a valid stipulation is binding upon the parties. *McGuire* v. *Baird*, 9 Cal. 2d 353, 70 P. 2d 915; *Webster* v. *Webster*, 216 Cal. 485, 14 P. 2d 522; see 23 Cal. Juris. 826. It is available at a second trial unless in terms otherwise limited, *Nathan* v. *Dierssen*, 146 Cal. 63, 79 P. 739; *Crenshaw* v. *Smith*, 74 A. C. A. 295, 168 P. 2d 752; see 100 A. L. R. 775, and will be controlling at the second trial unless the trial court relieves a party from the stipulation. *First National Bank* v. *Stansbury*, 118 Cal. App. 80, 5 P. 2d 13. Relief from a stipulation may be granted in the sound discretion of the trial court in cases where the facts stipulated have changed, there is fraud, mistake of fact, or other special circumstance rendering it unjust to enforce the stipulation. *Sacre* v. *Chalupnik*, 188 Cal. 386, 205 P. 449; *Back* v. *Farnsworth*, 25 Cal. App. 2d 212, 77 P. 2d 295; *Sinnock* v. *Young*, 61 Cal. App. 2d 130, 142 P. 2d 85; see 161 A. L. R. 1163. In the present case there is no intimation in the record or briefs of fraud, excusable neglect, or other ground for relief. Indeed the parties both accept the stipulation as accurate and complete.

decided. The jurisdictional objection is thus without merit. See *Gulf Refining Co.* v. *United States,* 269 U. S. 125, 136.

II. We turn then to the merits. Article I, Section 10, Clause 2 of the Constitution provides that "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress."

The Supreme Court of California held that this provision did not bar the tax because the delivery of the oil which resulted in the passage of title occurred prior to the commencement of the exportation. The court suggested, and the appellee concedes, that a different result might follow if the oil had been delivered to a common carrier; "for then it would have been placed in the hands of an instrumentality whose *sole purpose* is to export goods, thus indelibly characterizing the process as a part of exportation." 27 Cal. 2d p. 153, 163 P. 2d p. 3. The court, in reaching the conclusion that the tax was constitutional, rested in part on our recent decisions (particularly *McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 U. S. 33; *Department of Treasury* v. *Wood Preserving Corp.,* 313 U. S. 62; *International Harvester Co.* v. *Department of Treasury,* 322 U. S. 340) which sustained the levy of certain state taxes against the claim that they violated the Commerce Clause. The court concluded that if this had been an interstate transaction, it would have been subject to the tax. It saw no greater limitation on the power of the States under Article I, Section 10, Clause 2, than this Court has found to exist under the Commerce Clause.

We do not pursue the inquiry as to the validity of the tax under the Commerce Clause. For we are of the view that whatever might be the result of that inquiry, the tax is unconstitutional under Article I, Section 10, Clause 2. .

The two constitutional provisions, while related, are not coterminous. To be sure, a state tax has at times been held unconstitutional both under the Import-Export Clause and under the Commerce Clause. *Brown* v. *Maryland,* 12 Wheat. 419; *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292. But there are important differences between the two. The invalidity of one derives from the prohibition of taxation on the import or export; the validity of the other turns nowise on whether the article was, or had ever been, an import or export. See *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 665–66, and cases cited. Moreover, the Commerce Clause is cast, not in terms of a prohibition against taxes, but in terms of a power on the part of Congress to regulate commerce. It is well established that the Commerce Clause is a limitation upon the power of the States, even in absence of action by Congress. *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761; *Morgan* v. *Virginia,* 328 U. S. 373. But the scope of the limitation has been determined by the Court in an effort to maintain an area of trade free from state interference and at the same time to make interstate commerce pay its way. As recently stated in *McGoldrick* v. *Berwind-White Coal Mining Co., supra,* p. 48, the law under the Commerce Clause has been fashioned by the Court in an effort "to reconcile competing constitutional demands, that commerce between the states shall not be unduly impeded by state action, and that the power to lay taxes for the support of state government shall not be unduly curtailed." That accommodation has been made by upholding taxes designed to make interstate commerce bear a fair share of the cost of the local government from which it receives benefits (see e. g. *Western Live Stock* v. *Bureau of Reve-*

*nue*, 303 U. S. 250, 254–55, and cases cited; *McGoldrick* v. *Berwind-White Coal Mining Co., supra*) and by invalidating those which discriminate against interstate commerce, which impose a levy for the privilege of doing it, which place an undue burden on it. *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307; *Gwin, White & Prince, Inc.* v. *Henneford,* 305 U. S. 434; *Best & Co.* v. *Maxwell,* 311 U. S. 454; *Nippert* v. *Richmond,* 327 U. S. 416.

It seems clear that we cannot write any such qualifications into the Import-Export Clause. It prohibits every State from laying "any" tax on imports or exports without the consent of Congress. Only one exception is created— "except what may be absolutely necessary for executing it's inspection Laws." The fact of a single exception suggests that no other qualification of the absolute prohibition was intended. It would entail a substantial revision of the Import-Export Clause to substitute for the prohibition against "any" tax a prohibition against "any discriminatory" tax. As we shall see, the question as to what is exportation is somewhat entwined with the question as to what is interstate commerce. But the two clauses, though complementary, serve different ends. And the limitations of one cannot be read into the other.

It is suggested, however, that the history of the Import-Export Clause shows that it was designed to prevent discriminatory taxes and not to preclude the levy of general taxes applicable alike to all goods. Support for that is found in the fact that this provision was defended in the Convention [2] and later in the debates [3] on the ground that it protected the inland States from levies by the coastal States through the taxation of exports. Yet that func-

---

[2] See 2 Farrand, The Records of the Federal Convention (1911), pp. 307, 359–62, 442.

[3] See particularly Madison's statement, 3 Elliot's Debates (2d ed.) p. 483. And see The Federalist No. 42.

tion was only a phase of a larger design. The Import-Export Clause was considered in connection with Article I, Section 9, Clause 5, which provides that "No Tax or Duty shall be laid on Articles exported from any State." [4] The purpose was to withhold from Congress the power to tax exports,[5] and to deprive any State of the power except with the consent of Congress and even then, it seems, to require the net proceeds to be paid into the federal treasury. A proposal was made to prohibit the States "from taxing the produce of other States exported from their harbours." [6] But that suggestion was not followed. The language adopted was supported by Madison "as preventing all State imposts." [7] The qualified interpretation urged upon us has therefore no substantial support in the history of the Import-Export Clause. Moreover, to infer qualifications does not comport with the standards for expounding the Constitution. As stated by Chief Justice Marshall in *Sturges* v. *Crowninshield,* 4 Wheat. 122, 202, "it would be dangerous in the extreme to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation." For, as Chief Justice Taney said in *Holmes* v. *Jennison,* 14 Pet. 540, 570–71:

> "In expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole

---

[4] See 2 Farrand, op. cit., *supra,* note 2, pp. 305–08, 358–63, 441–42.

[5] The consensus of opinion was expressed by Gerry—that "the legislature could not be trusted with such a power. It might ruin the Country. It might be exercised partially, raising one and depressing another part of it." See 2 Farrand, op. cit., *supra,* note 2, p. 307. Or as stated by Sherman, "A power to tax exports would shipwreck the whole." *Id.,* p. 308.

[6] This was suggested by Langdon. See 2 Farrand, op. cit., *supra,* note 2, p. 361.

[7] See 2 Farrand, op. cit., *supra,* note 2, p. 442.

78

instrument, that no word was unnecessarily used, or needlessly added. The many discussions which have taken place upon the construction of the Constitution, have proved the correctness of this proposition; and shown the high talent, the caution, and the foresight of the illustrious men who framed it. Every word appears to have been weighed with the utmost deliberation, and its force and effect to have been fully understood. No word in the instrument, therefore, can be rejected as superfluous or unmeaning . . ."

We cannot, therefore, read the prohibition against "any" tax on exports as containing an implied qualification.

The questions remain whether we have here an export within the meaning of the constitutional provision and, if so, whether this tax was a prohibited impost upon it.

The requirement that foreign commerce be involved (*Woodruff* v. *Parham,* 8 Wall. 123, 136) is met, for concededly the oil was sold for shipment abroad. The question whether at the time the tax accrued the oil was an export presents a different problem. There are few decisions of the Court under Article I, Section 10, Clause 2, which illuminate the problem. In *Brown* v. *Houston,* 114 U. S. 622, Louisiana taxed coal held in that State for sale. After the tax was assessed some of the coal was sold for export. The Court held that the coal when taxed was not an export, saying, pp. 629–30:

"When taxed it was not held with the intent or for the purpose of exportation, but with the intent and for the purpose of sale there, in New Orleans. A duty on exports must either be a duty levied on goods as a condition, or by reason of their exportation, or, at least, a direct tax or duty on goods which are intended for exportation. Whether the last would be a duty on exports, it is not necessary to determine. But cer-

tainly, where a general tax is laid on all property alike, it cannot be construed as a duty on exports when falling upon goods not then intended for exportation, though they should happen to be exported afterwards."

In *Coe* v. *Errol,* 116 U. S. 517, the Court had before it a case under the Commerce Clause. Logs, cut in New Hampshire, were being held on a river there for transportation to Maine. New Hampshire's non-discriminatory tax on them was sustained. What the Court said concerning commerce is what we deem to be the correct principle governing exports: ". . . goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey." P. 527.

That view has been followed in cases involving Article I, Section 9, Clause 5 of the Constitution, which, as we have noted, prohibits Congress from laying any tax on "Articles exported from any State." In *Turpin* v. *Burgess,* 117 U. S. 504, the Court sustained a federal excise tax on manufactured tobacco. The tax was laid upon the goods before they left the factory. The Court said, p. 507, "They were not in course of exportation; they might never be exported; whether they would be or not would depend altogether on the will of the manufacturer." The same result was reached in *Cornell* v. *Coyne,* 192 U. S. 418, where a federal manufacturing tax on filled cheese was sustained against the claim that it was a tax levied by Congress on exports. The cheese was manufactured under contract for export. The Court said, "The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the exportation of

articles, and does not mean that articles exported are relieved from the prior ordinary burdens of taxation which rest upon all property similarly situated. The exemption attaches to the export and not to the article before its exportation." P. 427.

That line has been marked by other decisions under Article I, Section 9, Clause 5 of the Constitution. Thus a federal stamp tax on a foreign bill of lading is a tax on exports, since it is the equivalent of a direct tax on the articles included in the bill of lading. *Fairbank* v. *United States,* 181 U. S. 283. The same is true of federal stamp taxes on charter parties made exclusively for the carriage of cargo in foreign commerce, *United States* v. *Hvoslef,* 237 U. S. 1, 17, for a tax on those charter parties is "in substance a tax on the exportation; and a tax on the exportation is a tax on the exports." The same is likewise true of federal stamp taxes on policies insuring exports against maritime risks. *Thames & Mersey Ins. Co.* v. *United States,* 237 U. S. 19. The Court stated, p. 27:

"The rise in rates for insurance as immediately affects exporting as an increase in freight rates, and the taxation of policies insuring cargoes during their transit to foreign ports is as much a burden on exporting as if it were laid on the charter parties, the bills of lading, or the goods themselves. Such taxation does not deal with preliminaries, or with distinct or separable subjects; the tax falls upon the exporting process."

Closer in point is *Spalding & Bros.* v. *Edwards,* 262 U. S. 66. It involved a federal tax on baseball bats and balls sold by the manufacturer. A Venezuelan firm ordered a New York commission house to buy a quantity of bats and balls for their account. The New York commission house placed the order with the manufacturer instructing it to deliver the packages to an exporting carrier in

New York for shipment to Venezuela. The goods were delivered to the carrier and an export bill of lading was issued. In due course the goods were transported to Venezuela. The issue, as stated by the Court, p. 68, was "whether the sale was a step in exportation." The Court pointed out that the goods would not have been exempt from tax while they were "in process of manufacture" though they were intended for export but that they would be exempt "after they had been loaded upon the vessel for Venezuela and the bill of lading issued." The question was whether the "export had begun." After noting that title passed when the goods were delivered into the carrier's hands, the Court stated, pp. 69–70:

> "The very act that passed the title and that would have incurred the tax had the transaction been domestic, committed the goods to the carrier that was to take them across the sea, for the purpose of export and with the direction to the foreign port upon the goods. The expected and accomplished effect of the act was to start them for that port. The fact that further acts were to be done before the goods would get to sea does not matter so long as they were only the regular steps to the contemplated result."

The circumstance that title was in the New York commission house and that it might change its mind and retain the goods for its own use was dismissed by the statement that "Theoretical possibilities may be left out of account." P. 70. The Court concluded that if exportation was put at a later point, exports would not receive "the liberal protection that hitherto they have received." P. 70.

This line of cases was summarized in *Willcuts* v. *Bunn,* 282 U. S. 216, 228, as construing the constitutional prohibition against federal taxation of exports so as to give "immunity to the process of exportation and to the trans-

actions and documents embraced in that process. . . . Only on that construction can the constitutional safeguard be maintained."

The fact that delivery to a common carrier for export gave the sale immunity in *Spalding & Bros.* v. *Edwards, supra,* is seized upon as stating a rule that the process of exportation has not started until such delivery has been made. And cases like *Superior Oil Co.* v. *Mississippi,* 280 U. S. 390, are relied upon as indicating that delivery to the purchaser is not sufficient. That case arose under the Commerce Clause. Mississippi was upheld in its effort to tax a distributor or wholesaler who purchased gasoline and later took it to Louisiana for sale. The Court said, p. 395, that although the course of business indicated the likely destination of the oil, it was "in the hands of the purchaser to do with as it liked, and there was nothing that in any way committed it to sending the oil to Louisiana except its own wishes." The Court held, therefore, that the tax was not on goods moving in interstate commerce. But it added, p. 396, "Dramatic circumstances, such as a great universal stream of grain from the State of purchase to a market elsewhere, may affect the legal conclusion by showing the manifest certainty of the destination and exhibiting grounds of policy that are absent here."

The certainty that the goods are headed to sea and that the process of exportation has started [8] may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved. The present case is an excellent illustration. The foreign purchaser furnished the ship to carry the oil abroad. Delivery was made into the hold of the vessel

---

[8] See *Carson Petroleum Co.* v. *Vial,* 279 U. S. 95.

from the vendor's tanks located at the dock. That delivery marked the commencement of the movement of the oil abroad. It is true, as the Supreme Court of California observed, that at the time of the delivery the vessel was in California waters and was not bound for its destination until it started to move from the port. But when the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use. It would not be clearer that the oil had started upon its export journey had it been delivered to a common carrier at an inland point. The means of shipment are unimportant so long as the certainty of the foreign destination is plain.

It seems clear under the decisions which we have reviewed involving Article I, Section 9, Clause 5 of the Constitution that the commencement of the export would occur no later than the delivery of the oil into the vessel. As the meaning of "export" is the same under that Clause and the Import-Export Clause (see *Brown* v. *Maryland, supra,* p. 445; *Turpin* v. *Burgess, supra,* p. 506), the same result follows here.

It is argued, however, that the present tax is not an impost within the meaning of the Import-Export Clause. The tax is measured by the gross receipts of retail sales and is levied on retailers "For the privilege of selling tangible personal property at retail." Cal. Stats. 1935, p. 1253. The retailers are authorized to collect the tax from the consumers. Cal. Stats. 1933, p. 2602. And a sale is "any transfer of title or possession . . . in any manner or by any means whatsoever, of tangible personal property, for a consideration." Cal. Stats. 1935, p. 1256. The California Supreme Court held that the tax is an excise tax for the privilege of conducting a retail business meas-

ured by the gross receipts from sales; that it is not laid upon the consumer and does not become a tax on the sale or because of the sale. 27 Cal. 2d p. 152, 163 P. 2d p. 2.

That construction, being a matter of state law, is binding on us. But it is not determinative of the question whether the tax deprives the taxpayer of a federal right. That issue turns not on the characterization which the state has given the tax, but on its operation and effect. See *St. Louis Southwestern Ry. Co.* v. *Arkansas,* 235 U. S. 350, 362; *Kansas City, Ft. S. & M. R. Co.* v. *Kansas,* 240 U. S. 227, 231.

Appellee concedes that the prohibition of the Import-Export Clause would be violated if the goods were taxed as exports or because of their exportation, or if the process of exportation were itself taxed. We perceive, however, no difference in substance between any tax so labeled and the present tax. The California Supreme Court conceded that the delivery of the oil "resulted in the passage of title, and the completion of the sale, and the taxable incident." 27 Cal. 2d p. 153, 163 P. 2d pp. 2–3. The incident which gave rise to the accrual of the tax was a step in the export process.

Moreover, *Brown* v. *Maryland, supra,* rejected an argument that while a State could not tax imports, it could tax the privilege of selling imports. Chief Justice Marshall stated, p. 444:

> "All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself. It is true, the State may tax occupations generally, but this tax must be paid by those who employ the individual, or is a tax on his business. The lawyer, the physician, or the mechanic, must either charge more on the article in which he deals, or the thing itself is taxed through his person. This the State has a right to do, because no constitutional prohibition

extends to it. So, a tax on the occupation of an importer is, in like manner, a tax on importation. It must add to the price of the article, and be paid by the consumer, or by the importer himself, in like manner as a direct duty on the article itself would be made. This the State has not a right to do, because it is prohibited by the constitution."

The same reasoning was applied to exports, p. 445:

"The States are forbidden to lay a duty on exports, and the United States are forbidden to lay a tax or duty on articles exported from any State. There is some diversity in language, but none is perceivable in the act which is prohibited. The United States have the same right to tax occupations which is possessed by the States. Now, suppose the United States should require every exporter to take out a license, for which he should pay such tax as Congress might think proper to impose; would government be permitted to shield itself from the just censure to which this attempt to evade the prohibitions of the constitution would expose it, by saying, that this was a tax on the person, not on the article, and that the legislature had a right to tax occupations?"

The prohibition contained in the Import-Export Clause against taxation on exports clearly involves more than a mere exemption from taxes laid specifically upon the exported goods themselves. That is true of the constitutional prohibition against federal taxes on exports. *United States* v. *Hvoslef, supra.* What was said there (p. 13) is equally applicable here: "If it meant no more than that, the obstructions to exportation which it was the purpose to prevent could readily be set up by legislation nominally conforming to the constitutional restriction but in effect overriding it." And see *Anglo-Chilean Nitrate Sales Corp.* v. *Alabama,* 288 U. S. 218.

We conclude that the tax which California has exacted from appellant is an impost upon an export within the meaning of Article I, Section 10, Clause 2, and is therefore unconstitutional.

*Reversed.*

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting.

Richfield Oil Corporation, while doing business in California, sold oil extracted from California soil. Its purchaser bought the oil to transport and use abroad. California, like many other states, raises a large proportion of its revenue by a generally applied tax on sales.[1] The Court holds that application of the California sales tax to this transaction is a "tax on exports" and therefore violates Article I, Section 10, Clause 2 of the Federal Constitution. I cannot agree.

In *Spalding & Bros.* v. *Edwards,* 262 U. S. 66, 69, a precedent upon which today's decision heavily relies, this Court said that "with regard to any transaction we have to fix a point at which, in view of the purpose of the Constitution, the export must be said to begin. As elsewhere in the law there will be other points very near to it on the other side, so that if the necessity of fixing one definitely is not remembered any determination may seem arbitrary." This principle announced in the *Spalding* case seems to follow what was said in *Cornell* v. *Coyne,* 192 U. S. 418, 427, that the constitutional prohibition against a tax on exports was not intended to relieve exported articles "from the prior ordinary burdens of taxation which rest upon all property

---

[1] In 1945 California's total revenue was $676,828,000. It collected $242,757,000 from its sales tax. *California State Finances in 1945, 1 State Finances: 1945, Dept. of Commerce, Bureau of the Census* (1946) 33.

similarly situated." Every transaction held by this Court to have occurred *after* rather than *before* exportation began makes an encroachment not only on the power of states to tax, but, as the Court points out, the Federal Government's area of taxation is also narrowed. The result of such a holding is all the more serious because, unlike the consequences of holding a state tax invalid under the Commerce Clause, the prohibitions against taxing exports are, with a minor exception, permanent, absolute and unqualified. After today's ruling, Congress itself can neither tax nor permit states to tax sales like the one here proscribed. To classify sales transactions as having occurred after exportation began, therefore, results in creating an island of constitutional tax immunity for a substantial proportion of the profitable business of the nation. Such a result not only grants tax immunity to many profitable businesses which share governmental protections from payment of their fair part of taxes; it also throws an unfair part of the tax burden on others. Since we cannot assume that the framers of the Constitution looked with favor on such consequences, we should, before classifying a transaction in such a way as to render a tax on it unconstitutional, give it the most careful factual scrutiny. We should not invalidate such a tax unless satisfied beyond doubt that it falls squarely and wholly within the area marked by the Constitution for tax exemption.

The economic consequences of such sales taxes are probably about the same as would flow from a property or severance tax applied to Richfield. For all three types of taxes would likely be reflected in an increased sales price of Richfield's oil. No one, I suppose, would think of saying that such a property or severance tax would be unconstitutional as a tax on exports. The reason would be that the taxable event clearly arose before and not after exportation began. This sales tax was no more applied after export had actually begun than a property or severance

tax would have been. The tax was not even levied on an exporter or an exporter's agent or broker. Richfield was neither. Its sale of local California goods was negotiated and completed wholly in California. This purely intrastate sale transaction cannot properly be held to have lost its intrastate pre-exportation status by reason of the fact that the parties did not intend "title to pass" until the oil was delivered at the purchaser's ship. For formal "passage of title" is not an adequate criterion for measuring a state's constitutional power to tax sales made within the state. Private parties are free to decide, so far as their own interests are concerned, when legal title shall be considered to "pass." But a state surely is not required by the Constitution to forbear from taxing that part of a sales transaction which precedes the particular moment the parties have arbitrarily selected for a conceptual transfer of title. Nor need a state withhold the exercise of its power to tax sales until an article is delivered or paid for. That delivery, perhaps the last step in executing this agreement to sell, happened to border on the imaginary line where the actual exporter took possession does not justify us in concluding that therefore the whole sales transaction occurred after exportation. Constitutional interpretations which make serious inroads into the power of both the States and the Federal Government to tax sales made by local businesses should not turn on fine legal concepts of when title passed or delivery occurred in relation to the beginning of exportation.

Concededly, as the Court points out, the Constitution prohibits imposition of state and federal "imposts and duties" on "exports." But the Constitution does not define in words what is an impost or tax on exports and what is not. It is well known that taxation of exports was primarily forbidden by the Constitution at the insistence of inland states which feared that seaboard states would exact a tribute from all goods sold in the interior which were

thereafter transported through ports en route to foreign destinations. It was not intended to bestow a bounty of blanket tax immunity upon all those who engaged in the production, processing, purchase, or sale of goods shipped abroad. There was no broad purpose of encouraging foreign commerce by making all these preliminary steps tax free. The motivation of this tax and its economic consequences plainly are not those which the writers of the Constitution condemned. This was no tax on goods from an inland state which came through California in transit after severance, processing, and sale had been completed. Nor was it a disguised tax on a product of California soil or manufacture imposed solely because the oil was intended for a foreign destination. The tax was nothing more than an effort of California to defray a part of the state's expenses by a uniform sales tax on all those businesses, including Richfield, which enjoyed California's natural resources, the labor of its people, and the services and protection of its government.

True, the tax would impose a burden on export commerce to the extent that it increased the export price of Richfield oil. But if a tax on export sales be unconstitutional for imposing such a burden, so is a property tax or a severance tax applied to Richfield's oil anywhere from well to consumer. For all these types of taxes would likely be reflected in the price of Richfield's oil. But the history and the evolution of the constitutional prohibition against taxation of exports manifest that there was no intention to subsidize either export businesses or foreign purchasers by any such broad immunity from state and federal taxation.

I cannot believe that it was the purpose of the Constitution to let all goods destined for shipment abroad escape uniformly applied state and federal taxes, nor that a state whose resources are depleted is powerless to enforce its sales tax if the depleter sells to customers for immediate

shipment for ultimate use in foreign countries. No persuasive evidence has been produced to indicate that those who wrote the Constitution thought in such terms or that they would have handicapped the state and federal taxing power in such a way. And no other sufficiently cogent reasons have been advanced to require a present interpretation which so disarranges, confuses, and handicaps the sales taxes of all the states.