[No. 66774-2-I.   Division One.   April 2, 2012.]

AMERICAN HONDA MOTOR COMPANY, INC., *Appellant*, v. THE CITY OF SEATTLE, DEPARTMENT OF EXECUTIVE ADMINISTRATION, *Respondent*.

*Robert L. Mahon III* and *Donald M. Young* (of *Perkins Coie LLP*), for appellant.

*Peter S. Holmes, City Attorney*, and *Kent C. Meyer, Assistant*, for respondent.

¶1 SCHINDLER, J. — American Honda Motor Company Inc. (AHM) appeals summary judgment dismissal of its lawsuit

against the city of Seattle (City) to obtain a refund of business and occupation (B&O) taxes. AHM claims the B&O tax violates the Import-Export Clause of the United States Constitution, article I, section 10, clause 2. We affirm.

## FACTS

¶2 The facts are not in dispute. AHM is a California corporation registered to do business in Washington. AHM manufactures automobiles, all-terrain vehicles, motorcycles, parts, and power equipment in the United States, Japan, and Canada. AHM sells vehicles, parts, and equipment at wholesale to dealerships throughout the United States.

¶3 In 2008, the director of the City of Seattle Department of Executive Administration, Division of Revenue and Consumer Affairs (Director) conducted an audit of AHM for the period beginning January 1, 2003 through March 31, 2007. As part of the audit, the Director reviewed the financial records produced by AHM, including wholesale revenue reports, dealer lists, and tax return paperwork. The Director found that during the audit period, AHM sold vehicles at wholesale to Seattle Honda car dealership MN One Inc. and made sales to other Seattle customers, including motorcycle and power equipment dealerships. The Director also found that imported vehicles delivered "to the Seattle dealership [were] inspected and accepted by dealership employees."

¶4 The Director determined that AHM did not include the wholesale sales of the imported vehicles that were delivered to the Seattle dealership in the calculation of the gross sales subject to the B&O tax under the Seattle Municipal Code (SMC). AHM claimed that the wholesale sales of imported vehicles were subject to an exemption or deduction for purposes of the B&O tax. However, despite repeated requests from the Director for additional docu-

mentation, AHM did not provide any information in support of the position that it was entitled to an exemption from the B&O tax.

¶5 On August 28, 2008, the Director issued an assessment notifying AHM that under the SMC, AHM owed B&O taxes in the amount of $123,674. The Director concluded that the wholesale sales of the imported vehicles that were delivered by AHM and were "inspected and accepted" by the dealerships should have been included in the calculation of the gross income subject to the B&O tax. The Director calculated the B&O tax owed based on 0.00215 percent of the gross proceeds of sales.[1] With interest and penalties, the total was $154,902. The assessment notice states, in pertinent part:

Seattle Municipal Code (SMC) 5.45.080 B states, "A person engaging in business activities in the City who does not maintain an office or place of business in the City shall allocate to the City that portion of the taxpayer's gross income or gross proceeds of sales that are derived from business activities performed in the City." The Taxpayer makes sales to the Seattle Honda dealer in Seattle as well as various smaller dealers. Thus, the gross proceeds of sales to customers located in Seattle are taxable to the City of Seattle.

The taxpayer has made a claim that some of their sales are not subject to the Seattle B&O tax because they qualify for an import exemption or deduction. The taxpayer has not provided any information to substantiate this claim. The tax is imposed on AHM's business activity in the City, which includes the sale and delivery of goods and services in the City.

Per Seattle [Business Tax] Rule 5-44-193C, "sales of imports by an importer or his or her agent are not taxable and a deduction will be allowed with respect to the sales of such

---

[1] SMC 5.45.050(C). The City amended the taxation provisions of the SMC during the audit period and replaced former chapter 5.44 SMC (2001) with chapter 5.45 SMC (2002). Chapter 5.45 SMC has since been amended to change the numbering of certain provisions. Because the amendments do not result in a substantive change to the provisions of the SMC relevant to our analysis, we refer to the code provisions currently in effect.

goods, if at the time of sale such goods are still in the process of import transportation. *Immunity from tax does not extend to the sale of imports to Seattle customers by the importer* thereof or by any person after completion of importation whether or not the goods are in the original unbroken package or container." The vehicles are not still in the import stream since they are delivered to the Seattle customer (dealership).

¶6 AHM filed a lawsuit against the City to obtain a refund of the B&O tax, interest, and penalties.[2] AHM alleged that imposing the B&O tax on the wholesale sales of imported vehicles "prior to completion of import transportation" violates the Import-Export Clause of the United States Constitution.

¶7 AHM and the City filed cross motions for summary judgment. AHM did not challenge the facts set forth in the assessment notice. In addition, there was no dispute that a "portion of the sales made by Honda to the dealership located in Seattle consist of vehicles manufactured in Canada and Japan and imported by Honda." City Tax Audit Manager Joseph Cunha also states in his declaration that the City "has required that companies that sell imported goods that are delivered to customers located in Seattle pay the City's B&O tax" since at least 2000.[3]

¶8 The legal question raised in the cross motions for summary judgment was whether the Import-Export Clause prohibits the City from imposing the B&O tax on the wholesale sale of imported vehicles sold to dealerships in Seattle. The court ruled that the B&O tax assessment did not violate the Import-Export Clause and dismissed the lawsuit. AHM appeals.

---

[2] Jaguar Land Rover North America LLC and Volvo Cars of North America LLC also challenged assessments of the B&O tax on the wholesale sales of imported vehicles. However, Jaguar and Volvo do not appeal the trial court's ruling that the B&O tax does not violate the import-export clause.

[3] The City moved to strike paragraph five of the declaration submitted by AHM Senior Local Tax Analyst John Pouba. Paragraph five refers to an audit by the Washington State Department of Revenue. The trial court granted the motion to strike the paragraph. AHM does not appeal the decision to strike paragraph five.

## ANALYSIS

■ ■ ¶9 We review a decision on summary judgment and questions of law de novo. *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993). The construction of a city tax ordinance is also a question of law reviewed de novo. *Ford Motor Co. v. City of Seattle, Exec. Servs. Dep't*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007). The burden is on the taxpayer to establish that a B&O tax assessment is incorrect.[4] *Ford*, 160 Wn.2d at 41.

¶10 Relying heavily on the decision in *Richfield Oil Corp. v. State Board of Equalization*, 329 U.S. 69, 76-85, 67 S. Ct. 156, 91 L. Ed. 80 (1946), AHM contends the B&O tax assessment violates the Import-Export Clause of the United States Constitution. The City contends that under the Supreme Court's analysis in *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 96 S. Ct. 535, 46 L. Ed. 2d 495 (1976), and *Department of Revenue v. Ass'n of Washington Stevedoring Cos.*, 435 U.S. 734, 98 S. Ct. 1388, 55 L. Ed. 2d 682 (1978), the B&O tax does not violate the Import-Export Clause.

¶11 Article I, section 10, clause 2 of the United States Constitution prohibits state and local governments from levying an impost or duty on imports or exports.

> No State shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws: and the net produce of all duties and imposts, laid by any state on imports or exports, shall be for the use of the treasury of the United States; and all such laws shall be subject to the revision and control of the congress.

U.S. CONST. art. I, § 10, cl. 2.

¶12 Before *Michelin* and *Washington Stevedoring*, the determination of whether a state or local tax violated the

---

[4] Under SMC 5.55.140(B), the assessment is prima facie correct.

Import-Export Clause focused on whether the tax "reached imports or exports." *Wash. Stevedoring*, 435 U.S. at 752. With respect to imports, the Court analyzed whether the Import-Export Clause prohibited states from imposing "a nondiscriminatory ad valorem property tax on imported goods until they lose their character as imports." *Michelin*, 423 U.S. at 282. With respect to exports, "the dispositive question was whether the goods had entered the 'export stream,' the final, continuous journey out of the country. As soon as the journey began, tax immunity attached." *Wash. Stevedoring*, 435 U.S. at 752.[5] The Court also previously assumed that the Import-Export Clause prohibited state and local governments from imposing any tax on imports or exports. *Richfield*, 329 U.S. at 76.

¶13 In *Richfield*, the Court addressed whether a state retail sales tax assessed on the sale of oil by a California company to the government of New Zealand violated the Import-Export Clause. *Richfield*, 329 U.S. at 71. California assessed the retail sales tax based on gross receipts from the transaction after the oil was loaded onto the New Zealand naval tanker. *Richfield*, 329 U.S. at 71-72.

¶14 The Court accepted the determination of the California Supreme Court that the tax "is an excise tax for the privilege of conducting a retail business measured by the gross receipts from sales . . . and does not become a tax on the sale or because of the sale." *Richfield*, 329 U.S. at 83-84. But the Supreme Court concluded that the question of whether "the tax deprives the taxpayer of a federal right" turns not on the characterization of the tax under state law but, rather, on "its operation and effect." *Richfield*, 329 U.S. at 84. The Court also notes that the State conceded that if the oil was taxed as an export, "or because of . . . exportation," the tax would violate the Import-Export Clause. *Richfield*, 329 U.S. at 84.

¶15 Because the State imposed the tax after the oil was loaded onto the tanker, the Court concluded that "[t]he

---

[5] (Citations omitted.)

incident which gave rise to the accrual of the tax was a step in the export process," and there was no "probability that the oil would be diverted to domestic use." *Richfield*, 329 U.S. at 84, 83.

> The foreign purchaser furnished the ship to carry the oil abroad. Delivery was made into the hold of the vessel from the vendor's tanks located at the dock. That delivery marked the commencement of the movement of the oil abroad. It is true, as the Supreme Court of California observed, that at the time of the delivery the vessel was in California waters and was not bound for its destination until it started to move from the port. But when the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use.

*Richfield*, 329 U.S. at 82-83.

¶16 Strictly construing the language of the Import-Export Clause, the Court held that the Constitution prohibits state and local government from imposing "any" tax on imports or exports, and "prohibits every State from laying 'any' tax on imports or exports without the consent of Congress." *Richfield*, 329 U.S. at 76 (quoting U.S. CONST. art. I, § 10, cl. 2).

¶17 In *Michelin* and *Washington Stevedoring*, the Court adopted a different approach to cases claiming the protection of the Import-Export Clause. *Michelin* changed the focus of the analysis to "whether the tax sought to be imposed is an 'Impost or Duty' " as contemplated by the framers of the Constitution, and expressly abandoned the concept that the Import-Export Clause prohibited "all forms of state taxation" on imports and exports. *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 360, 104 S. Ct. 1837, 80 L. Ed. 2d 356 (1984); *Michelin*, 423 U.S. at 279.

> [T]his Court in *Michelin* specifically abandoned the concept that the Import-Export Clause constituted a broad prohibition against all forms of state taxation that fell on imports. *Michelin* changed the focus of Import-Export Clause cases from the

nature of the goods as imports to the nature of the tax at issue. The new focus is not on whether the goods have lost their status as imports but is, instead, on whether the tax sought to be imposed is an "Impost or Duty."

*Limbach*, 466 U.S. at 360.

¶18 The Court in *Michelin* addressed whether an ad valorem property tax on inventory that included tires and tubes imported from France and Nova Scotia violated the Import-Export Clause. *Michelin*, 423 U.S. at 279-80. After examining the history of the Import-Export Clause and the meaning of the words "impost" and "duty," the Court held that "the Clause is not written in terms of a broad prohibition of every 'tax.'" *Michelin*, 423 U.S. at 290.

"Imposts" were like customs duties, that is, charges levied on imports at the time and place of importation. "Duties" was a broader term embracing excises as well as customs duties, and probably only capitation, land, and general property exactions were known by the term "tax" rather than the term "duty." The characteristic common to both "imposts" and "duties" was that they were exactions directed at imports or commercial activity as such and, as imposed by the seaboard States under the Articles of Confederation, were purposefully employed to regulate interstate and foreign commerce and tax States situated less favorably geographically.

*Michelin*, 423 U.S. at 291-93.[6] The Court concludes that the intent of the clause was to prevent states from imposing exactions on "the privilege of moving [goods] through a State." *Michelin*, 423 U.S. at 290.

Nothing in the history of the Import-Export Clause even remotely suggests that a nondiscriminatory ad valorem property tax which is also imposed on imported goods that are no longer in import transit was the type of exaction that was regarded as objectionable by the Framers of the Constitution.

*Michelin*, 423 U.S. at 286.

---

[6] (Citation and footnote omitted.)

¶19 In determining whether a tax is "the type of state exaction which the Framers of the Constitution . . . had in mind as being an 'impost' or 'duty,'" *Michelin*, 423 U.S. at 283, the Court identified three main concerns that must be taken into consideration as follows:

> The Framers of the Constitution . . . sought to alleviate three main concerns by committing sole power to lay imposts and duties on imports in the Federal Government, with no concurrent state power: [(1)] the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; [(2)] import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and [(3)] harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically.

*Michelin*, 423 U.S. at 285-86.[7]

¶20 In addressing the first concern, the Court determined that the ad valorem property tax on the imported tires and tubes did not "deprive the Federal Government of the exclusive right to all revenues from imposts and duties on imports and exports" but, rather, paid for services provided by the local government. *Michelin*, 423 U.S. at 286. In reaching that conclusion, the Court differentiates between taxes that apportion "the cost of such services as police and fire protection among the beneficiaries," and "imposts" and "duties." *Michelin*, 423 U.S. at 287.

> Unlike imposts and duties, which are essentially taxes on the commercial privilege of bringing goods into a country, such property taxes are taxes by which a State apportions the cost of such services as police and fire protection among the benefi-

---

[7] (Footnotes omitted.)

ciaries according to their respective wealth; there is no reason why an importer should not bear his share of these costs along with his competitors handling only domestic goods.

*Michelin*, 423 U.S. at 287.

■ ¶21 The Court states that "nondiscriminatory property taxation can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce." *Michelin*, 423 U.S. at 286-87. While the Court agreed that the Import-Export Clause clearly prohibits a state from imposing a tax "based on the foreign origin of the imported goods," the Court states that the Import-Export Clause does not permit different treatment or exemption from uniform taxes that are imposed for services without regard to import or export status. *Michelin*, 423 U.S. at 287.

> The Import-Export Clause clearly prohibits state taxation based on the foreign origin of imported goods, but it cannot be read to accord imported goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the State supplies.

*Michelin*, 423 U.S. at 287.

¶22 The Court also concluded that the tax did not interfere with the free flow of imported goods among the states because it was not assessed on goods in transit through the state.

> In effect, the Clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State. A non-discriminatory ad valorem property tax obviously stands on a different footing, and to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by prohibiting the assessment of even nondiscriminatory property taxes on goods which are merely in transit through the State when the tax is assessed.

*Michelin*, 423 U.S. at 290.[8] The tax on imported tires did not " 'intercept[ ] the import, *as an import*, in its way to become

---

[8] (Footnote omitted.)

incorporated with the general mass of property.' " *Michelin*, 423 U.S. at 298 (quoting *Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 443, 6 L. Ed. 678 (1827)).

¶23 The Court also concluded the nondiscriminatory ad valorem tax did not usurp the authority of the federal government to regulate foreign relations because it was applied to all property and was not based on import status. *Michelin*, 423 U.S. at 286.

> By definition, such a tax does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any importation in a manner inconsistent with federal regulation.

*Michelin*, 423 U.S. at 286. The Court states that the goods stored in the distribution warehouse "operated no differently than would be a distribution warehouse utilized by a wholesaler dealing solely in domestic goods." *Michelin*, 423 U.S. at 302. Based on the analysis of the three main policy concerns, the Court held that "the nondiscriminatory property tax levied on petitioner's inventory of imported tires" was not an impost or duty prohibited by the Import-Export Clause of the Constitution. *Michelin*, 423 U.S. at 302.

¶24 In *Washington Stevedoring*, the Court addressed the question of whether a B&O excise tax on the " 'privilege of engaging in business activities' " as measured by the gross income of the business of loading and unloading imports and exports from cargo ships violated the Import-Export Clause. *Wash. Stevedoring*, 435 U.S. at 738 n.4 (quoting RCW 82.04.290(1)).

¶25 In determining whether the B&O tax was an impost or duty that violated the Import-Export Clause, the Court addressed the three policy considerations identified in *Michelin* in analyzing the nature of the tax.

> *Michelin* initiated a different approach to Import-Export Clause cases. It ignored the simple question whether the tires

and tubes were imports. Instead, it analyzed the nature of the tax to determine whether it was an "Impost or Duty." 423 U. S., at 279, 290-294. Specifically, the analysis examined whether the exaction offended any of the three policy considerations leading to the presence of the Clause.

*Wash. Stevedoring*, 435 U.S. at 752.

¶26 The Court concludes that because the B&O tax is a general business tax that applies to business activity conducted in the state of Washington, it did not create an impediment to the federal government. Because the tax was not imposed on the goods but, rather, compensated the State for the services and protection extended to the stevedoring business, the Court states that there is a "reasonable nexus" between the B&O tax and the State. *Wash. Stevedoring*, 435 U.S. at 754-55. The Court also concludes that the tax "is properly apportioned, does not discriminate, and relates reasonably to services provided by the State." *Wash. Stevedoring*, 435 U.S. at 754-55.

¶27 Noting that the Court in *Michelin* "qualified its holding" based on "the observation" that the tax applied to goods no longer in transit, the Court also addresses the question of whether "a tax relating to goods in transit" was nonetheless an impost or duty under the Import-Export Clause. *Wash. Stevedoring*, 435 U.S. at 755.

> The Court in *Michelin* qualified its holding with the observation that Georgia had applied the property tax to goods "*no longer in transit.*" 423 U. S., at 302. Because the goods were no longer in transit, however, the Court did not have to face the question whether a tax relating to goods in transit would be an "Impost or Duty" even if it offended none of the policies behind the Clause. Inasmuch as we now face this inquiry, we note two distinctions between this case and *Michelin*. First, the activity taxed here occurs while imports and exports are in transit. Second, however, the tax does not fall on the goods themselves. The levy reaches only the business of loading and unloading ships or, in other words, the business of transporting cargo within the State of Washington. Despite the existence of the

first distinction, the presence of the second leads to the conclusion that the Washington tax is not a prohibited "Impost or Duty" when it violates none of the policies.

*Wash. Stevedoring*, 435 U.S. at 755.[9]

¶28  Although the B&O tax was imposed on loading and unloading imports and exports "in transit," the Court held that because "the tax does not fall on the goods themselves" but on the business of transporting cargo within the state, the B&O tax was not an impost or duty that violated the Import-Export Clause. *Wash. Stevedoring*, 435 U.S. at 755. In reaching that conclusion, the Court expressly rejects the argument that the Import-Export Clause "effects an absolute prohibition on all taxation of imports and exports," and states that the decision in *Richfield* is "limited to the question whether the tax fell upon the sale or upon the right to retail." *Wash. Stevedoring*, 435 U.S. at 759. And as the Court points out, the analysis in *Richfield* "ignores the central holding of *Michelin* that the absolute ban is only of 'Imposts or Duties' and not of all taxes." *Wash. Stevedoring*, 435 U.S. at 759.

### City of Seattle B&O Tax

¶29  Here, like the B&O excise tax in *Washington Stevedoring*, the City's B&O tax is an excise tax imposed on the privilege of engaging in the business of wholesale sales in the City and is measured by a percentage of gross income.

> A B&O tax is an excise tax imposed for "the privilege of doing business" in a particular jurisdiction. 1B KELLY KUNSCH ET AL., WASHINGTON PRACTICE: METHODS OF PRACTICE § 72.7, at 452 (1997). Washington imposes a B&O tax for the privilege of doing business in this state. RCW 82.04.220. Cities may also impose their own B&O tax for the exercise of the privilege within that city. The value of the "privilege is measured by the gross proceeds of the business; the rate of tax is determined by the

[9] (Emphasis added) (footnote omitted).

type of business in which the taxpayer is engaged." 1B KUNSCH ET AL., *supra*, § 72.7, at 452.

*Ford*, 160 Wn.2d at 39.

¶30 In *Ford*, our Supreme Court identified the three basic elements that trigger the B&O tax.

A tax statute has three basic elements: "First, there must be an incident that triggers the tax." [1B KUNSCH ET AL., *supra*,] § 72.3, at 449. The "taxable incident" is the "activity that the legislature has designated as taxable." *Id*. Second, there must be a base that represents the value of the taxable incident. This is known as the "tax measure." *Id*. Third, there must be a "tax rate," which, when multiplied by the tax measure, determines "the amount of tax due." *Id*. At issue in this case are the taxable incident and tax measure of Seattle and Tacoma's B&O tax.

*Ford*, 160 Wn.2d at 39.

¶31 The "taxable incident" is the act or privilege of engaging in business activities in the City. *Ford*, 160 Wn.2d at 39. The definition of "business" in the SMC is broad and includes "all activities engaged in with the object of gain, benefit, or advantage to the taxpayer." SMC 5.30.020(H).

¶32 As the court made clear in *Ford*, a B&O tax "is levied upon the privilege of doing business as a wholesaler, not upon the actual sales at wholesale." *Ford*, 160 Wn.2d at 42.

A tax imposed on the actual sale of products is, by definition, a sales tax. B&O taxes, on the other hand, are not sales taxes. The cities' municipal codes plainly tell us that their B&O taxes are imposed on "the act or privilege of engaging in business activities within the City." SMC 5.45.050.

*Ford*, 160 Wn.2d at 42.

¶33 By its terms, the SMC limits its taxing authority "to only those gross receipts derived from the sale of goods delivered" to the City. *Ford*, 160 Wn.2d at 46. Under SMC 5.45.050(C), "every person engaging within the City in the business of making sales . . . at wholesale" is subject to a B&O tax at the rate of 0.00215 percent. SMC 5.45.050(C) states:

Upon every person engaging within the City in the business of making sales of retail services, or making sales at wholesale or retail; as to such persons, the amount of tax with respect to such business shall be equal to the gross proceeds of such sales of the business without regard to the place of delivery of articles, commodities or merchandise sold, multiplied by the rate of .00215.

¶34 The SMC also expressly requires a sufficient nexus between the B&O tax and the activity of engaging in business. SMC 5.30.030(B)(5) provides, in pertinent part:

The City expressly intends that engaging in business include any activity sufficient to establish nexus for purposes of applying the tax under the law and the constitutions of the United States and the State of Washington.

¶35 Nonetheless, AHM argues that the City's B&O tax on the business of engaging in wholesale sales of imported vehicles that is measured by gross receipts violates the Import-Export Clause. We disagree.

¶36 First, the tax does not burden or interfere with federal government regulation or commerce. The City's B&O tax is a general business tax that is imposed on the privilege of engaging in the business of wholesale sales in the City as measured by gross income from the sales. Second, the tax compensates the City for the services provided in order to engage in the business of wholesale sales. Third, the tax is "properly apportioned, does not discriminate," and reasonably relates to the services provided by the City. *Wash. Stevedoring*, 435 U.S. at 755.

¶37 In support of its argument that the B&O tax violates the Import-Export Clause, AHM cites a recent federal export clause[10] case, *United States v. International Business Machines Corp.*, 517 U.S. 843, 116 S. Ct. 1793, 135 L. Ed. 2d 124 (1996) (*IBM*). In *IBM*, the Court addressed a federal tax on exports and the application of the export clause, not the

---

[10] U.S. CONST art. I, § 9, cl. 5.

Import-Export Clause. *IBM*, 517 U.S. at 845. Nonetheless, AHM points to dicta in *IBM* to assert that because the imported vehicles are "in transit," the City's B&O tax violates the Import-Export Clause.

> The Court has never upheld a state tax assessed directly on goods in import or export transit. In *Michelin*, we suggested that the Import-Export Clause would invalidate application of a nondiscriminatory property tax to goods still in import or export transit. 423 U.S. at 290 (compliance with the Import-Export Clause may be secured "by prohibiting the assessment of even nondiscriminatory property taxes on [import or export] goods which are merely in transit through the State when the tax is assessed").

*IBM*, 517 U.S. at 862.[11]

¶38 But contrary to the assertion that the imported vehicles that were sold to the dealerships are "in transit," the unchallenged findings establish that the vehicles are not "in transit." In the assessment notice, the Director expressly states that the vehicles AHM imports from Japan and Canada are no longer in transit "since they are delivered to the Seattle customer (dealership)." *See also Ford*, 160 Wn.2d at 52 (upholding B&O tax on business of wholesale sales of vehicles delivered to dealers in the City). Here, as in *R.J. Reynolds Tobacco Co. v. Durham County, North Carolina*, 479 U.S. 130, 107 S. Ct. 499, 93 L. Ed. 2d 449 (1986), because the vehicles AHM sold to the Seattle dealership were delivered and accepted by the dealership, there was "nothing transitory about" the wholesale sale of the cars.

> The imported tobacco here, we repeat, has nothing transitory about it: it has reached its State — indeed, its county — of destination and only the payment of the customs duty, after the appropriate aging, separates it from entrance into the domestic market.

*Reynolds*, 479 U.S. at 155.

---

[11] (Alteration in original.)

¶39 We affirm dismissal of the lawsuit against the City.

GROSSE and BECKER, JJ., concur.

Review denied at 175 Wn.2d 1004 (2012).